In re HOTEL SYRACUSE, INC., Debtor.

HOTEL SYRACUSE, INC., Plaintiff,

v.

CITY OF SYRACUSE INDUSTRIAL DEVELOPMENT AGENCY, Manufacturers Hanover Trust Company/Central New York, Apple Bank for Savings and Syracuse Economic Development Corporation, Defendants.

Bankruptcy No. 90–02921.
Adv. No. 91–60166A.

United States Bankruptcy Court,
N.D. New York.

Feb. 5, 1993.

---

Shaw, Licitra, Esernio & Schwartz, P.C., Garden City, NY (Stuart I. Gordon, of counsel), for debtor.

Hiscock & Barclay, Syracuse, NY (Laura Harris, Robert Barrer, of counsel), for SIDA and SEDCO.

Menter, Rudin & Trivelpiece, P.C., Syracuse (Peter Hubbard, of counsel), Simpson, Thacher & Bartlett, New York City (Robert A. Bourque, of counsel), for Mfrs. Hanover Trust Co./Cent. New York.

Shea & Gould, New York City (Eric P. Wainer, of counsel), for Apple Bank.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

Presently before the Court and considered herein is the motion by Hotel Syracuse, Inc. ("Debtor"), filed on July 30, 1992, and the cross-motion by the City of Syracuse Industrial Development Agency ("SIDA") and Syracuse Economic Development Corporation ("SEDCO"), filed on August 4, 1992, seeking summary judgment on the issue of whether an agreement dated May 2, 1982, entitled Lease Agreement ("Lease") constitutes a "true lease" for purposes of § 365(d)(4) of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code"). Manufacturers Hanover Trust Company ("MHTC"), predecessor-in-interest to Chemical Bank ("Chemical"),[1] filed a memorandum of law in support of the proposition that the Lease is a true lease.

At the conclusion of oral argument held in Syracuse, New York on August 11, 1992, the parties were provided the opportunity to submit memoranda of law on the issues presented. The matter was thereafter submitted for decision on September 14, 1992.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over the parties and subject matter of this core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a), 157(b)(1), (b)(2)(A), (M) and (O).

## FACTS

Debtor operates the Hotels at Syracuse Square ("Hotels" or "Hotel Premises"). The Hotels consist of a 725–room hotel complex, located at 500 South Warren Street in downtown Syracuse, and are comprised of the original Hotel Syracuse and a 200–room Hilton Hotel annex ("Hilton Wing") which was completed in 1982.

On October 26, 1990 Debtor filed a voluntary petition ("Petition") under Chapter 11 of the Bankruptcy Code in the Southern District of New York. On or about November 14, 1990, the venue for the case was transferred to this Court. Debtor continues in the operation of its business as a debtor-in-possession pursuant to Code §§ 1107(a) and 1108.

Debtor's sole shareholder is Joseph M. Murphy, Sr. ("Murphy"). Prior to the events giving rise to the controversy *sub judice* Debtor conveyed fee ownership of the original Hotel Syracuse to Ho–Syr Properties ("Ho–Syr"), a New York limited partnership. Thereafter, Ho–Syr holding title to the premises, leased same to the Debtor who has continued to operate and manage the Hotels.[2]

SIDA is a public benefit corporation created pursuant the "New York State Industrial Development Agency Act" (the "Act"), 1969 N.Y.Laws, ch. 1030, which is codified at Article 18–A of the New York General Municipal Law ("N.Y.Gen. Municipal Law"). As an industrial development agency ("IDA"), SIDA's statutory purpose is, among other things, to promote the economic welfare and prosperity of the inhabitants of the State of New York by assisting in the acquisition, construction and improvement of industrial, commercial and recreation facilities. *See* N.Y. Gen. Municipal Law § 858 (McKinney 1986). SIDA was created specifically for the benefit of the City of Syracuse and its inhabitants. *See* N.Y. Gen. Municipal Law § 926 (McKinney 1986).

On or about May 2, 1981, Debtor, Ho–Syr, the City of Syracuse, and SIDA entered into an agreement ("Agreement"), *see* Adv.Compl. Exhibit A, to create a financing package for the original Hotel Syracuse which was to provide substantial cap-

---

1. At the oral argument Counsel for MHTC announced that Chemical Bank had succeeded to the interests of MHTC in the present litigation. In order to avoid confusion the Court will continue to refer to MHTC where such distinction is relevant.

2. By Order dated January 5, 1993, M.A. Bennett Associates Ltd. assumed operational control of the Hotels for a period of six months pursuant to an agreement with the Debtor.

ital for refurbishment and expansion, specifically including the construction of the Hilton Wing.

As part of the financing package Ho–Syr agreed to convey title to the Hotel's premises to SIDA,[3] who in turn agreed to lease the premises back to Ho–Syr for the annual sum of one dollar plus, *inter alia,* monthly payments sufficient to provide for the payment of the principal, interest, and premiums, if any, on industrial development bonds issued by SIDA in furtherance of the project. SIDA's ownership interest in the Hotels would permit it to mortgage the Hotels as security for the repayment of such bonds. Ho–Syr was also required under the Agreement to make certain additional payments in connection with the use and occupation of the premises including taxes, special assessments and payments in lieu of taxes ("Pilot Payments"). Such payments, however, would be lower than the actual taxes that would have been assessed against the Hotel Premises absent SIDA's participation.

Thus, on or about May 2, 1981, SIDA and Ho–Syr entered into the Lease. *See* Adv. Compl. Exhibit D. The Lease was for a term of thirty years with an option to renew, exercisable by Ho–Syr, for an additional sixty years. Under its terms, Ho–Syr was required to purchase the premises back from SIDA at the expiration or earlier termination of the Lease upon full payment of all of the bonds executed by the parties. The re-purchase price fixed under the Lease is $100.00. *See* Adv.Compl. Exhibit D, at § 20.1.

On or about the same date, Ho–Syr entered into a subleasing agreement with Debtor. *See* Adv.Compl. Exhibit E. Thereafter, on or about December 31, 1986, Ho–Syr assigned its interest in the prime lease with SIDA to Debtor. *See* Adv. Compl. Exhibit F.

Financing for the project came from several sources. Initially, MHTC provided the sum of $7,550,000.00 pursuant to a building loan agreement entered into by SIDA, Ho–Syr, the Debtor and MHTC.[4] As evidence of such indebtedness, on or about May 2, 1981, SIDA, Ho–Syr and Debtor issued a $7,550,000.00 "special obligation" bond, *see* Adv.Compl. Exhibit B, payable to MHTC. As a special obligation, the bond provides that it is payable solely from the "rents and other sums payable by [the Debtor] pursuant to the [Lease] and 'Sub-lease Agreement', the 'Mortgaged Property' ... and any other security ... which may be given to [MHTC]." *See id.* at p. 2. Further, the bond provides that "[it] and the interest herein shall never constitute a debt of the State of New York nor of the City of Syracuse...." *See id.* On or about the same date, and to collateralize the obligations under the bond, SIDA, Ho–Syr and the Debtor executed a mortgage and security agreement in favor of MHTC in, *inter alia,* the Hotel Premises, items of personalty located therein, including, but not limited to, furniture, fixtures, office equipment, etc., as well as the mortgagor's right, title and interest in other leases relating to the premises. *See* Adv.Compl. Exhibit C.

Also on or about this date, SIDA, Ho–Syr, and Debtor entered into an agreement to borrow $4,000,000.00 from SEDCO as evidenced by the special obligation bond issued in that amount and made payable to SEDCO. *See* Adv.Compl. Exhibit H. This obligation was secured by a second mortgage and a security agreement against the Hotels which were executed on or about the same date. *See* Adv. Complaint Exhibit I. On or about April 27, 1982, SEDCO assigned its interest in the bond and mortgage to MHTC, *see* Adv. Complaint Exhibit

---

**3.** The Agreement provides only that SIDA intends to acquire a "sufficient interest" in the premises to enable it to undertake the "acquisition, construction and equipping" of the Hotels as an authorized project under the Act. *See* Adv.Compl. Exhibit A, at p. 3. However, each of the mortgages executed in furtherance of the project by SIDA, Debtor and Ho–Syr expressly warrant that SIDA has fee title to the Hotel

Premises. *See, e.g.,* Adv.Compl. Exhibit C, Art. I, § 1.01(a).

**4.** Debtor did not attach a copy of the building loan agreement to its papers. However, the bond, a copy of which was provided, makes specific reference thereto. *See* Adv.Compl. Exhibit B.

J, thus merging SEDCO's second mortgage with the first mortgage held by MHTC.

Also on or about May 2, 1981, SIDA borrowed $3,500,000.00 from SEDCO pursuant to a building loan agreement by and between SIDA, Ho–Syr, Debtor and SEDCO. *See* Adv.Compl. Exhibit O. To evidence this indebtedness, SIDA, Ho–Syr, and Debtor issued a $3,500,000.00 special obligation bond payable to SEDCO, *see* Adv.Compl. Exhibit O, which was secured by a mortgage and security agreement dated April 30, 1981. *See* Adv.Compl. Exhibit P.

On or about September 22, 1982, SIDA, Ho–Syr, Debtor and MHTC executed a document entitled "Supplemental Mortgage and Consolidation Agreement" ("Supplemental Mortgage"), *see* Adv.Compl. Exhibit K, to consolidate and secure the parties' previous indebtedness then totalling approximately $12,550,000.00, and to secure an additional loan made by MHTC on the same day in the amount of $1,000,000.00.

In yet another transaction, taking place on or about December 15, 1983, Ho–Syr and the Debtor executed a $5,000,000.00 promissory note payable to Security Savings and Loan Association ("Security"). *See* Adv.Compl. Exhibit L. Security's loan was secured by a mortgage executed by SIDA, Ho–Syr and the Debtor, *see* Adv. Complaint Exhibit M, which purports to be junior only to MHTC's first mortgage.[5] *See id.* at § 1.15. On or about the same date, and as additional security, the parties executed an assignment of rents and leases on behalf of Security. *See* Adv.Compl. Exhibit N. Subsequently, Security conveyed its interests under the note and mortgage to an individual named Howard Curd ("Curd") who thereafter assigned his interests to Apple Bank for Savings ("Apple").

On or about July 27, 1990, SIDA gave notice of default under the Lease to Debtor, and demanded cure. On or about August 10, 1990, SEDCO declared a default under the SEDCO note and Mortgage.

Unsuccessful in its initial attempts to obtain new financing to eliminate the arrears on the lease payments, Debtor, on or about August 1, 1990, commenced a "Yellowstone" proceeding in state court, *see First National Stores, Inc. v. Yellowstone Shopping Center, Inc.*, 21 N.Y.2d 630, 290 N.Y.S.2d 721, 237 N.E.2d 868 (1968), seeking preliminary injunctive relief against SIDA in its attempts to evict Debtor from the Hotels. In that action Debtor sought, *inter alia*, to toll the period within which to cure the alleged defaults under the Lease, and to enjoin SIDA from enforcing or otherwise proceeding to terminate the Lease or to recover possession of the Hotels. In an order dated September 28, 1990, the Honorable Norman Mordue, Justice of the New York Supreme Court, Onondaga County, denied Debtor's motion for a preliminary injunction. Judge Mordue's order was never appealed.

Initially, Debtor commenced this adversary proceeding on July 3, 1991, by the filing of a complaint naming SIDA, SEDCO, MHTC and Apple as defendants, seeking, *inter alia*, a declaratory judgment that the Lease is not a true lease for purposes of Code § 365(d)(3) and (4), but is rather a collateral security agreement securing the obligations of Debtor under a financing package arranged by SIDA.

Subsequent to certain Orders entered by the Court concerning Debtor's obligations under the purported lease pursuant to Code § 365(d)(3), *see* Memorandum–Decision–Order of August 8, 1991 ("Decision of 8/8/91") and Memorandum–Decision–Order of July 13, 1992 ("Decision of 7/13/92"), Debtor filed the instant motion seeking summary judgment on the lease/no-lease issue. In opposition thereto, SIDA and SEDCO filed a cross-motion seeking summary judgment against the Debtor.

### ARGUMENTS

Debtor contends that no issue of material fact remains to be resolved in this adver-

---

5. In its answer SIDA denies that Apple, as successor-in-interest to Security and then to Curd, has a second mortgage lien against the Hotels. Despite this apparent dispute, however, the rela- tive priority among these lien holders is not material to the resolution of the question presented herein.

sary proceeding. It is Debtor's position, therefore, that the legal issues raised by the pleadings may be determined upon motion for summary judgment. Here, Debtor contends that the Lease is not a "true lease" for purposes of Code § 365(d)(4). Debtor argues that the economic substance of the Lease, e.g. rental payments which are directly related to the payment of principal and interest on the bonds, Debtor's continuing obligation to make payments in lieu of taxes as well other payments for special assessments, sewerage charges, etc., and the mandatory buy back provision for nominal consideration, belies the true nature of the Lease as a secured financing transaction and renders the Lease not a true lease as a matter of law. Therefore, Debtor contends, Code § 365(d)(4) is simply not applicable here.

In opposition, SIDA contends that the parties intended to enter into a true lease. Additionally, SIDA asserts that the Lease is valid under state law, which it contends is controlling as to the determination of the instant issue. Further, that in light of SIDA's statutory purpose to promote the economic prosperity and general welfare of the people and the City of Syracuse, the transaction was set up as a lease to permit SIDA to replace Debtor, as lessee, in the event of Debtor's default. Further, SIDA contends that the Lease is a true lease as defined by Code § 365(m) since it is a rental agreement to use real property.

■ SIDA also argues that Debtor is precluded from denying that the Lease is a true lease under the principles of res judicata, collateral estoppel, law of the case and waiver since the Debtor admitted in the state court *Yellowstone* proceedings that the lease was a valid lease for the use of commercial property.[6]

Additionally, SIDA contends that Debtor's prior conduct with regard to the Lease estops Debtor from denying its validity here. Further, that a determination that the transaction did not result in a true lease would be contrary to N.Y.Gen. Municipal Law §§ 850–888, thus violating the principles of deference and comity.

Alternatively, SIDA contends that if the Court should find the Lease to be a secured financing transaction, then the Court should also find that due to the existence of continuing obligations for both Debtor and SIDA, that the transaction is an executory contract which Debtor must assume or reject pursuant to Code § 365(a).

## DISCUSSION

### A. SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), made applicable here pursuant Rule 7056 of the Federal Rules of Bankruptcy Procedure ("Fed. R.Bankr.P."), provides that summary judgement must be granted where there exists "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Federal Deposit Ins. Corp. v. Bernstein*, 944 F.2d 101, 106 (2d Cir.1991) (quoting Fed.R.Civ.P. 56(c)). It is the movant's burden to establish that no issue of material fact exists. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986)). In considering whether to grant a motion for summary judgment, a court "cannot try issues of fact; it can only determine whether there are issues to be tried...." *Donahue v. Windsor Locks Bd. of Fire Comm.*, 834 F.2d 54, 58 (2d Cir.1987).

The issue presented on the instant motion and cross-motion for summary judgment involves the applicability of Code § 365(d)(4) to a sale/lease-back transaction entered into by Debtor's assignor and

---

**6.** To establish entitlement to a *Yellowstone* injunction, the plaintiff must prove the following elements: (1) it holds a commercial lease; (2) it has received notice of default; (3) the application for a temporary restraining order was made and granted prior to the termination of the lease; and (4) it has the desire and ability to cure the alleged default by any means short of vacating the premises. *See Stuart v. D & D Associates, Inc.*, 160 A.D.2d 547, 554 N.Y.S.2d 197 (1st Dept.1990).

SIDA. In order for the Court to make this determination, it must first be determined whether the transaction resulted in a "true lease" rather than some other type of financial arrangement between the parties. In this regard, the parties agree that there are no issues of material fact to be resolved, and that the determination to be made is one solely of law. Upon review of all of the pleadings, papers and arguments presented herein, the Court agrees that there are no material questions of fact yet to be resolved. However, before considering the merits of the legal issues presented, the Court must first determine whether Debtor is precluded or estopped from challenging the validity of the Lease for purposes of Code § 365(d)(4).

## B. RES JUDICATA/COLLATERAL ESTOPPEL / LAW OF THE CASE / WAIVER

SIDA and MHTC contend that Debtor's pleadings in the prior state court proceeding constitute an admission that the Lease is what it purports to be; to wit, a true lease of real property. Further, that since Debtor's admission gave rise to a valid judgment on the merits in that proceeding, Debtor is now precluded by the principles of res judicata, collateral estoppel, law of the case and waiver from re-litigating the validity of the Lease here.

Any analysis of the preclusive effect to be accorded a prior state court judgment in a subsequent action commenced in federal court begins with 28 U.S.C. § 1738, commonly known as the "full faith and credit statute".

28 U.S.C. § 1738 requires a federal court to give a prior state court judgment the same preclusive effect that the judgment would be entitled to in a subsequent proceeding in a court of that state. *See Allen v. McCurry,* 449 U.S. 90, 94–97, 101 S.Ct. 411, 415–16, 66 L.Ed.2d 308 (1980); *Migra v. Warren City School District Bd. of Educ.,* 465 U.S. 75, 84–86, 104 S.Ct. 892, 898, 79 L.Ed.2d 56 (1984). Thus, when confronted with a problem involving the preclusive effect of a prior state court judgment, a federal court must look to the law of the state in which the judgement was issued to determine whether a court of that state would give the judgment preclusive effect. If so, the federal court must then inquire whether the federal statute governing the current litigation either expressly or impliedly repeals or creates an exception to full faith and credit. *See In re Comstock Financial Services, Inc.,* 111 B.R. 849, 854 (Bankr.C.D.Cal.1990) (citing *Marrese v. American Academy of Ortho. Surgeons,* 470 U.S. 373, 379–80, 105 S.Ct. 1327, 1331, 84 L.Ed.2d 274 (1985)).

At the outset, the Court finds that it is well settled law in New York that the grant or denial of a preliminary injunction does not constitute the law of the case, nor does it serve as an adjudication of the merits of the underlying claim. *See Park East Apts., Inc. v. 233 East 86th Street Corp.,* 139 Misc.2d 806, 529 N.Y.S.2d 674, 676 (Sup.Ct.1988), *aff'd,* 143 Misc.2d 60, 543 N.Y.S.2d 610 (1st Dep't.1989); *Ratner v. Fountain Clove Road Apts., Inc.,* 118 A.D.2d 843, 500 N.Y.S.2d 329, 330 (2d Dept. 1986). Neither does such a decision act as collateral estoppel or *res judicata* in a subsequent action since the purpose of a preliminary injunction is merely to hold the matter in status quo until an opportunity is afforded to decide the case on the merits. *See Ryger v. Segal,* 129 Misc.2d 763, 494 N.Y.S.2d 617, 618 (Sup.Ct.1985) (citing *Walker Memorial Baptist Church v. Saunders,* 285 N.Y. 462, 474, 35 N.E.2d 42 (1941) (other citations omitted)). Therefore, the preclusionary doctrines relied upon by SIDA do not bar Debtor from litigating here the issue "admitted" in support of the preliminary "Yellowstone" injunction, namely the existence of the Lease, since the denial of the preliminary injunction standing alone does not constitute a final adjudication on the merits of that issue. The consequences, if any, of Debtor's assertion of a contrary position in a subsequent judicial proceeding might properly be redressed under the principles of estoppel. *See* Discussion, *infra.*

Significantly, however, SIDA cross-moved against Debtor in the state court for an order granting, *inter alia,* summary

judgment dismissing Debtor's complaint, declaring that SIDA had the right to proceed to enforce the Lease in accordance with its terms, declaring that SIDA had the right to proceed to repossess the Hotel Premises pursuant to Article 7 of the New York Real Property Actions and Proceedings Law ("RPAPL") and vacating the temporary restraining order issued, pursuant to Debtor's Order to Show Cause, on or about August 14, 1990.

Ruling from the bench on September 25, 1990, Judge Mordue denied Debtor's application for a preliminary Yellowstone injunction finding that Debtor had failed to demonstrate that it had the ability to cure the alleged defaults by any means short of vacating the Hotel Premises. *See* Transcript of Hearing of 9/25/90, at p. 2. In granting SIDA's cross-motion, Judge Mordue expressly declined to rule on the propriety of SIDA's choice of forum or procedure for recovering possession of the Hotel Premises. Judge Mordue formalized his decision with written Order issued on or about September 28, 1990. The issue to be determined here is what preclusive effect, if any, should be accorded to the Order granting summary judgment in favor of SIDA's cross-motion.

The doctrine of res judicata, or "claim preclusion", provides that "once a claim is fully litigated between certain parties and 'merged' into a final judgment, those same parties are barred from re-litigating that claim." *In re Comstock Financial Services, Inc., supra,* 111 B.R. at 854 (citing *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955), other citations omitted); *Brown v. Felsen,* 442 U.S. 127, 130–32, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979).

■ New York has adopted the transactional approach to res judicata. *See O'Brien v. City of Syracuse,* 54 N.Y.2d 353, 445 N.Y.S.2d 687, 688, 429 N.E.2d 1158, 1159 (1981) (citation omitted); *Coun-*

*ty of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1387, 1392 (E.D.N.Y.1989), *aff'd,* 907 F.2d 1295 (2d Cir.1990). Under this approach, once a claim is brought to a final conclusion, all other claims arising out of the same transaction, or series thereof, are barred, even if based upon different theories, or seeking a different remedy. *See O'Brien, supra,* 445 N.Y.S.2d at 688, 429 N.E.2d at 1159.

■ A fundamental prerequisite to invocation of res judicata, however, is that the party against whom the doctrine is sought to be invoked must have been able to litigate in the prior proceeding the issue now sought to be precluded. *See Mirkin and Gordon, P.C. v. Suffolk County—Local 852 Civil Service Employees Ass'n Legal Services Fund,* 112 A.D.2d 272, 491 N.Y.S.2d 718, 720 (2d Dep't.1985) (citing *Schuykill Fuel Corp. v. Nieberg Realty Corp.,* 250 N.Y. 304, 165 N.E. 456 (1929)). In New York, a claim is not barred by res judicata if the court in which the first action was brought lacked subject matter jurisdiction to adjudicate the claim. *See Cullen v. Margiotta,* 811 F.2d 698, 732 (2d Cir.), *cert. denied, Nassau County Republican Comm. v. Cullen,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987) (citing *Salwen Paper Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 72 A.D.2d 385, 424 N.Y.S.2d 918, 922 (2d Dep't.1980), other citations omitted).

■ The doctrine of res judicata, however, is not applicable to the instant proceeding since the bankruptcy court has exclusive jurisdiction under Code § 365 to determine whether leases and contracts may be assumed or rejected by a debtor-in-possession. *See* 28 U.S.C. § 1334(d).[7] *See In re Texaco, Inc.,* 77 B.R. 433, 438 (Bankr. S.D.N.Y.1987); *In re Corporacion de Servicios Medicos Hosp.,* 805 F.2d 440, 444 n. 3 (1st Cir.1986). Since Debtor could not have asserted a claim that the Lease did

---

7. 28 U.S.C. § 1334(d) grants exclusive jurisdiction over all property of the debtor and of the estate to the United States District Courts. By standing Order of the District Court for the Northern District of New York dated July 20, 1984, all cases and proceedings arising under

Title 11 of the United States Code, as well as those proceedings arising in or related to a case under such Title, pending on June 27, 1984, or filed on or after June 28, 1984, were referred to the Bankruptcy Judges for the District.

not give rise to the type of legal relationship subject to assumption or rejection under Code § 365 in the state court, it should not be barred from doing so here. *See Cullen v. Margiotta, supra*, 811 F.2d at 732. This is not to say, however, that Debtor should be permitted to relitigate in this Court factual or legal issues identical to those necessarily decided in the prior proceeding, where it can be shown that legal standards identical to those applicable to a determination under Code § 365(d)(4) were employed. The preclusive effect to be accorded such findings, however, is more appropriately considered under the doctrine of collateral estoppel.

■ The doctrine of collateral estoppel precludes a party, or those in privity, from re-litigating in a subsequent action or proceeding issues that were clearly raised and decided against that party in a prior proceeding. *See Ryan v. New York Telephone Co.*, 62 N.Y.2d 494, 478 N.Y.S.2d 823, 826, 467 N.E.2d 487, 490 (1984). As this doctrine is applied by the courts in New York only two requirements must be satisfied. First, the party seeking to invoke the benefit of collateral estoppel must prove that the identical issue sought now to be precluded was necessarily decided in the prior proceeding and is decisive in the present action. *See D'Arata v. New York Central Mut. Fire Ins. Co.*, 76 N.Y.2d 659, 563 N.Y.S.2d 24, 26, 564 N.E.2d 634, 636 (1990) (citing *Kaufman v. Eli Lilly and Co.*, 65 N.Y.2d 449, 455, 492 N.Y.S.2d 584, 482 N.E.2d 63 (1985)). Second, the party against whom collateral estoppel is sought to be applied must have had a full and fair opportunity to contest the issue in the prior proceeding. *See id.; Halyalkar v. Board of Regents*, 72 N.Y.2d 261, 266, 532 N.Y.S.2d 85, 527 N.E.2d 1222 (1988) (citations omitted). It is the burden of the party opposing the preclusion to establish the absence of a full and fair opportunity to litigate the issue in the prior proceeding. *See D'Arata, supra*, 563 N.Y.S.2d at 26, 564 N.E.2d at 636 (citing *Kaufman, supra*, 65 N.Y.2d at 455–56, 492 N.Y.S.2d 584, 482 N.E.2d 63).

■ A key issue involved in SIDA's cross-motion was whether it could enforce the Lease according to its terms and thus proceed to commence summary dispossess proceedings against Debtor pursuant to Article 7 of the RPAPL. SIDA also argued that in the event that a preliminary Yellowstone injunction was granted, Debtor should be required to produce an undertaking, pursuant to New York Civil Practice Law and Rules ("NYCPLR") § 6312(b), sufficient to secure SIDA against the complete forfeiture of monies which the Hotel owed under the Lease.

Significantly, in opposition to the cross-motion in the state court proceeding, Debtor alleged, *inter alia*, that SIDA had an insufficient fee interest in the Hotel Premises to enforce the terms of the Lease so as to demand payment of rent or to commence an action to evict Debtor, primarily because the Lease was in essence a "financing structure" set up as a lease in order to provide Debtor with certain tax benefits that would not otherwise be realizable. *See* Murphy Affidavit (undated) in Response to Affidavit of Frank Harrigan, at ¶ 11–12. Debtor also contended, *inter alia*, that in light of SIDA's allegedly "illusory" interest in the fee, an undertaking would not be required in the event that the preliminary injunction should be granted. Implicit in this argument is the contention that the lease itself was illusory and therefore not enforceable by SIDA. SIDA responded by asserting that having received the benefits of the Lease, Debtor is estopped from denying SIDA's interest in the Hotels and its right to enforce the Lease's terms.

In light of the denial of the Yellowstone injunction it would have been unnecessary for Judge Mordue to consider further the parties' arguments with respect to the nature of SIDA's fee interest in the Hotels as that issue related to the necessity for an undertaking. Although Judge Mordue found certain default provisions of the Lease enforceable by SIDA, e.g., ¶¶ 16.2, 16.3 and 19.1, he did not make any specific findings with respect to the "true nature" of the parties' agreement. In light of the issues presented in the state court, as

framed by the pleadings and the arguments presented at the hearing, it seems implicit in Judge Mordue's order only that he found SIDA to have at least acquired a "sufficient interest" in the Hotel Premises to lease same back to Debtor as the parties had bargained, *see* Adv.Compl. Exhibit C, Art. I, § 1.01(a), and that, therefore, SIDA would be permitted to proceed according to the terms of the Lease to seek redress for Debtor's alleged defaults under its terms. Judge Mordue expressly declined to rule on the propriety of SIDA's choice of forum or procedure for recovering possession of the Hotel Premises.

SIDA has not presented any proof that Judge Mordue's holding should be read any more broadly than that the Lease satisfied the state law definition of a lease, which provides that a lease is an agreement which " 'transfer[s] ... absolute control and possession of property at an agreed rental.' " *Riverview Apts. Co. v. Golos*, 97 A.D.2d 917, 470 N.Y.S.2d 758, 760 (3d Dept.1983) (quoting *Feder v. Caliguira*, 8 N.Y.2d 400, 208 N.Y.S.2d 970, 171 N.E.2d 316 (1960)), *appeal dismissed by*, 62 N.Y.2d 976, 479 N.Y.S.2d 342, 468 N.E.2d 297 and 62 N.Y.2d 606, 482 N.Y.S.2d 1023, 472 N.E.2d 327 (1984). In determining whether a particular agreement constitutes a lease, a court is to look to the rights and obligations created under the agreement to determine whether it transfers a sufficient degree of dominion and control over the property. *Id.* (citations omitted). Significantly for collateral estoppel purposes, SIDA has not shown that it was necessary for Judge Mordue to determine whether the Lease might have also been a hybrid lease/financing transaction. Without clearly determining this issue, the decision reached in that proceeding is not decisive of the issue *sub judice. See* Discussion, *infra.*

■ Moreover, to satisfy the identity of issue requirement for collateral estoppel purposes, the issue must have been actually litigated in the prior proceeding. *See Kaufman, supra,* 492 N.Y.S.2d at 589, 482 N.E.2d at 68 (citing Restatement (Second) of Judgments, *supra,* at § 27, other cita-

tions omitted). For a question to have been actually litigated it must have been properly raised by the pleadings or otherwise placed in issue and actually determined in the prior proceeding. *See Halyalkar v. Board of Regents, supra,* 72 N.Y.2d at 266, 532 N.Y.S.2d 85, 527 N.E.2d 1222. While Debtor did raise the issue in the state court, Judge Mordue made no express finding as to the nature of the Lease and it does not appear that the issue was necessarily determined there. Since that issue was not determined in the prior proceeding, it was not actually litigated for purposes of collateral estoppel.

Under the circumstances present, the Court finds that SIDA has not established: 1) the requisite identity of issue between the prior state court adjudication and this adversary proceeding; 2) that the state court necessarily determined that the Lease did not also have the attributes of a financing transaction; 3) that the prior determination would be decisive of the issue *sub judice;* and 4) that the identical issue was actually litigated in the prior proceeding so as to preclude Debtor from re-litigating in this Court the true nature of the Lease.

SIDA also contends that the prior adjudication constitutes the law of the case as to the issues raised in this proceeding. However, it is well established law in New York that the law of the case doctrine applies only where there has been a final determination of a controversy on the merits. *See Gray v. Sandoz Pharmaceuticals, Inc.,* 123 A.D.2d 829, 507 N.Y.S.2d 444, 445 (2d Dep't. 1986) (citing *Globe Indemnity Co. v. Franklin Paving Co.,* 77 A.D.2d 581, 430 N.Y.S.2d 109, 110 (2d Dep't.1980)). Since the issue of whether the Lease was a true lease for purposes of Code § 365(d)(4) was not necessarily determined in the prior action, the law of the case doctrine does not apply to preclude Debtor from litigating the issue here.

■ Additionally, no evidence has been presented to indicate that Debtor intended to relinquish the right to challenge the validity of the Lease for purposes of Code § 365(d)(4) in a subsequent bankruptcy pro-

ceeding. *See, e.g., In re Delta Hotel of Syracuse, Inc.,* 10 B.R. 585, 597 (Bankr. N.D.N.Y.1981) (waiver is the intentional relinquishment of a known right). Thus, Debtor's conduct in the state court cannot be viewed as a waiver of this defense here.

## C. ESTOPPEL

 SIDA contends that Debtor should be estopped in this case from alleging that the Lease is anything but a true lease since Debtor is the recipient of numerous benefits due to the characterization of the agreement as a lease under state law, and because the Debtor asserted in the prior state court proceeding that the Lease was a commercial lease.

SIDA does not specify which type of estoppel it is seeking to invoke. However, SIDA relies principally on *In re Martin Bros. Toolmakers, Inc.,* 796 F.2d 1435 (11th Cir.1986), the holding of which is based in part on equitable estoppel grounds. *See id.* at 1441.

The essential elements of equitable estoppel are stated in *In re Delta Hotel of Syracuse, Inc., supra,* 10 B.R. at 598 (citing *United States v. Bedford Associates,* 491 F.Supp. 851, 866–67 (S.D.N.Y.1981)):

> The essential elements relating to the party to be estopped are: 1) conduct which amounts to false representation or concealment of material facts or which give the impression that the facts are other than as asserted, 2) an intention or expectation that such conduct would be relied upon by the other party, and 3) actual or constructive knowledge of the real facts. The elements relating to the party asserting the estoppel defense are: 4) lack of knowledge of the real facts, 5) reliance on the conduct of the party to be estopped, and 6) action based thereon resulting in a prejudicial change of position.

*Id.*

SIDA is not entitled to assert the defense of equitable estoppel here. While it is true that Debtor is the recipient of significant benefits attendant upon its participation in the IDA financing transaction, namely real property tax savings, exemptions from state sales taxes, transfer and mortgage recording taxes, as well as lower financing and operating costs, SIDA has failed to establish that its participation was based on any intentionally misleading representation made by the Debtor upon which it relied to its detriment. *See Famulare v. Huntington Hospital,* 78 A.D.2d 547, 432 N.Y.S.2d 33, 34 (2d Dept.1980) (citations omitted).

Additionally, any reliance by SIDA on Debtor's conduct and participation in the IDA financing scheme is unreasonable and equally unavailing since there is no proof that Debtor made any representation to SIDA that it would not seek the protection of Title 11 of the United States Code should there be a change in the Debtor's financial circumstances during the course of their relationship. Thus, SIDA's reliance on *In re Martin Bros., supra,* 796 F.2d 1435, is misplaced as the *Martin Bros.* court did not properly account for the purposes to be served by Code § 365(d)(4). *See* Discussion, *infra.*

Further, Debtor's treatment of the Lease as a security agreement has been consistent throughout the duration of this case. Debtor's Schedule A–2 lists MHTC, Apple and SEDCO as creditors holding secured claims. Debtor's Schedule B–2 lists the Hotels as real property owned by the Debtor. Additionally, payments to MHTC, Apple and SEDCO are listed as payments of loans. *See* Petition, line 13(a). On line 17 of the Petition, Debtor states that it is not a tenant of a business property. Significantly, Debtor's Statement of Executory Contracts, attached to the Petition, lists the Lease with SIDA with the following qualifier: *"Without Prejudice To Debtor's Rights To Assert That Said Lease Is Not A True Lease, Rather A Financing Vehicle." See id.* (emphasis added). *Compare In re Rachels Industries, Inc.,* 109 B.R. 797, 801 (Bankr.W.D.Tenn.1990) (holding, *inter alia,* that the debtor was estopped from changing its position that its IDA lease was not a true lease after the debtor took the position in pleadings as well as hearings that the lease was subject to assumption under Code § 365). Thus, equita-

ble estoppel does not apply under these circumstances.

■ Applying the doctrine of judicial estoppel, the Court still concludes that the Debtor is not barred from challenging the validity of the Lease for purposes of Code § 365(d)(4). In general, judicial estoppel prevents a party who has obtained a favorable judgment in one proceeding from subsequently adopting an inconsistent position in another judicial proceeding. *See Chemical Bank v. Aetna Ins. Co.*, 99 Misc.2d 803, 417 N.Y.S.2d 382, 384 (Sup.Ct.1979) (citations omitted); *Young v. United States Dept. of Justice*, 882 F.2d 633, 639 (2d Cir.1989), *cert. denied*, 493 U.S. 1072, 110 S.Ct. 1116, 107 L.Ed.2d 1023 (1990).

■ While the circumstances under which judicial estoppel may be applied are far from clear, *see Young v. United States Department of Justice, supra*, 882 F.2d at 639, it appears that the following elements are essential to its invocation: i) an " 'unequivocal assertion of law or of fact' " by a party in a judicial proceeding; ii) an " 'intentionally inconsistent' " assertion by that same party in a subsequent judicial proceeding; iii) a purpose to " 'mislead the [c]ourt and thereby obtain unfair advantage against another party' ", *see Vista Co. v. Columbia Pictures Industries, Inc.*, 725 F.Supp. 1286, 1286–93 (S.D.N.Y.1989) (quoting *United States · v. Starrett City Assocs.*, 605 F.Supp. 262, 264 (E.D.N.Y. 1985), other citations omitted), and iv) success in the prior proceeding. *See Merrill Lynch v. Georgiadis*, 903 F.2d 109, 114 (2d Cir.1990) (citing *Konstantinidis v. Chen*, 626 F.2d 933, 939 (D.C.Cir.1980)).

In the instant proceeding, judicial estoppel is unavailing in the first instance since Debtor failed to obtain a favorable judgment in the prior adjudication. *See id.* Even if this Court were to conclude that

Judge Mordue's order constituted a "judicial acceptance" of Debtor's factual assertion that the Lease was a commercial lease, thereby satisfying the success requirement, *see Vista Co. v. Columbia Pictures Ind., Inc., supra*, 725 F.Supp. at 1293 n. 2, Debtor would still not be judicially estopped from asserting here that the Lease does not satisfy the requirements of Code § 365(d)(4) since judicial estoppel only applies when the positions asserted are truly inconsistent; that is, the truth of one necessarily precludes the truth of the other. *See Federal Deposit Ins. Corp. v. CNA Casualty of Puerto Rico*, 786 F.Supp. 1082, 1086 (D.Puerto Rico 1991) (citing 18 C. Wright, A. Miller & E. Cooper, Fed. Practice & Procedure, § 4447 (1981)). Debtor's position before this Court, that the Lease is not a true lease, is not truly inconsistent with the position taken in the state court since, as will be discussed more fully *infra*, an agreement which meets the state law definition of a lease but which also serves primarily as a financing vehicle might nonetheless be found not to satisfy the requirements of Code § 365(d)(4). *See In re Moreggia & Sons, Inc.*, 852 F.2d 1179, 1182 (9th Cir.1988). Under these circumstances Debtor's conduct cannot reasonably be viewed as an attempt to mislead the Court in order to obtain an unfair advantage against SIDA. Thus, Debtor is not judicially estopped from contesting the nature of the Lease in this Court.

## D. APPLICABILITY OF CODE § 365(d)

At the heart of the instant adversary proceeding is the issue of whether Code § 365(d)(4) applies to the Lease. If it does, as SIDA contends, then the Lease will be deemed to have already been rejected by operation of law since the period Debtor had in which to assume or reject the Lease has already expired.[8] *See* Decision of

---

**8.** In its Decision of 8/8/91, this Court found that it could not extend the time Debtor had in which to comply with its obligations under the Lease beyond sixty days from the date of filing despite the Court's ability to extend the time to accept or reject the Lease well beyond that initial period. Thus, the Court's Order granting Debtor's motion to extend the period for thirty days beyond final judgment in the "lease v. no

lease" adversary was conditioned on the Debtor making payments to SIDA in accordance with Code § 365(d)(3).

The Decision of 8/8/91 was affirmed by the District Court on November 4, 1991. Further appeal to the Court of Appeals was voluntarily dismissed with prejudice by a stipulation of the

7/13/92. Under this scenario, Debtor would be required to surrender the Hotels to SIDA. *See* Code § 365(d)(4). Debtor, on the other hand, contends that Code § 365(d)(4) is not applicable here, since the Lease is not a "true lease" as contemplated by that section of the Code.

The Second Circuit has interpreted Code § 365(d)(4) as being applicable only to "true" or "bona fide" leases as defined by Code § 502(b)(6). *In re PCH Associates,* 804 F.2d 193, 199–200 (2d Cir.1986); *see also International Trade Admin. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744, 750 (2d Cir.1991).

■ In holding the Code § 502(b)(6) "true lease" requirement applicable to determinations under Code § 365(d)(4), the Second Circuit stated that "these sections, [when] read together, are part of a total scheme designed to set forth the rights and obligations of landlords and tenants involved in bankruptcy proceedings." *See In re PCH Associates, supra,* 804 F.2d at 199 (citations omitted). Thus, when a debtor/tenant rejects a lease pursuant to Code § 365(d)(4), such rejection constitutes a breach of the lease under Code § 365(g), which brings Code § 502(b)(6) into effect. *Id.* at 200. Code § 502(b)(6) limits a landlord's claim for breach of the lease to three years of future rent, plus any unpaid rent due at the time of the breach. *Id.*

■ Contrary to the position taken by SIDA, the fact that the Lease is a "rental agreement to use real property", *see* Code § 365(m), is not in and of itself sufficient to establish the applicability of Code § 365(d)(4). *See In re PCH Associates, supra,* 804 F.2d at 199. Moreover, while state law determines whether an agreement is a lease, *see In re Moreggia & Sons, Inc., supra,* 852 F.2d at 1182, merely meeting the state definition of a lease does not mandate the unthinking application of § 365(d)(4). *Id.* at 1183. In light of the purposes served by this section of the Code, *see* Discussion *infra,* the proper fo-

cus in determining whether Code § 365(d)(4) is applicable to a particular agreement is " 'whether the parties intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship.' " *Rensselaer Polytechnic Inst., supra,* 936 F.2d at 748 (quoting *In re PCH Associates, supra,* 804 F.2d at 200).

■ In making this determination a court is not constrained by the labels placed upon the transaction by the parties. Rather, the court must look to the economic substance of the transaction to determine whether it is in fact a "true" lease. *See Rensselaer Polytechnic Institute, supra,* 936 F.2d at 748 (citing *In re PCH Associates, supra,* 804 F.2d at 200); *accord In re Moreggia & Sons, Inc., supra,* 852 F.2d at 1182.

■ The presence of certain factors have been held relevant for purposes of determining whether a particular transaction constitutes a true lease pursuant to Code § 365(d)(4). Included among these are: (i) whether the "rental" payments were calculated to compensate the lessor for the use of the land, or rather were structured for some other purpose, such as to ensure a particular return on an investment; (ii) whether the purchase price was related to the fair market value of the land, or whether it was calculated as the amount necessary to finance the transaction; (iii) whether the property was purchased by the lessor specifically for the lessee's use; (iv) whether the transaction was structured as a lease to secure certain tax advantages; (v) whether the lessee assumed many of the obligations normally associated with outright ownership, including the responsibility for paying property taxes and insurance. *See In re PCH Associates, supra,* 804 F.2d at 200–01 (citations omitted). Also relevant are lease provisions which permit or require the lessee to purchase the premises for a nominal sum at the end of

---

parties filed with the Court of Appeals on August 5, 1992.

In the Decision of 7/13/92, this Court found that because Debtor failed to make the required

payments, Debtor had forfeited the right to extend the period beyond the initial sixty days. Debtor did not file a notice of appeal from that Order.

the lease term.[9] *See In re Wingspread Corp.*, 116 B.R. 915, 923 (Bankr.S.D.N.Y. 1990); *In re Opelika Mfg. Corp.*, 67 B.R. 169, 171 (Bankr.N.D.Ill.1986). Applying these factors to the Lease, the Court finds that the parties' agreement does not constitute a "true lease" for purposes of Code § 365(d)(4).

First, the Court finds that the rental payments under the Lease are not calculated to compensate SIDA for Debtor's use and occupation of the Hotel Premises. Specifically, Art. II, § 2.1 of the Lease provides, in pertinent part, that "Lessee" agrees to pay to "Lessor" a net annual rental in accordance with Schedule "B" of the Lease, payable in equal monthly installments. Schedule "B" provides, *inter alia*, that in addition to the $1.00 annual rental payment due on January 1st of each Lease year, Lessee is obligated to pay for any and all costs in connection with the use and occupation of the Hotel Premises including all mortgage payments and payments in lieu of taxes as agent of Lessor.[10] Significantly, § 2.2 of the Lease provides that the amount Debtor would be required to pay as "rent" under these provisions is subject to upward or downward adjustment "reflecting any changes in payments on mortgages now or hereinafter placed on the demised premises." *Id.* Thus, as is typical of IDA financing transactions, the rental payments required under the Lease, while related to Debtor's use of the Hotel Premises, are structured primarily to ensure the payment of principal and interest on the indebtedness secured by the Hotel Premises. *See*

*Postler & Jaeckle, supra,* 582 N.Y.S.2d at 329.

Moreover, the purchase price of the Hotels was unrelated to the actual market value of those premises. Since the rental payments are directly tied to the level of indebtedness secured against the Hotels, it is apparent that the purchase price of the Hotels was calculated to be the amount necessary to finance the development project, which specifically included, *inter alia,* the construction of the Hilton Wing.

Additionally, the Hotel Premises were acquired by SIDA specifically for, *inter alia,* Debtor's use and benefit. In acquiring title to the Hotels and in entering into the Lease, SIDA was able to create a "project", as that term is defined by N.Y.Gen. Municipal Law § 854(4) (McKinney 1986), thereby benefiting the Debtor by providing low cost financing for refurbishment and for expansion of the original Hotel Syracuse. In so doing, SIDA acted in furtherance of its statutory purpose of promoting job opportunities and economic development in downtown Syracuse.

Further, the legislative history of Code § 502(b)(6) provides that "the fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributable to outright ownership of the property is more indicative of a financing transaction than of a true lease." S.Rep. No. 989, 95th Cong., 2d Sess. 64, *reprinted in,* 1978 U.S.Code Cong. & Admin.News 5787, 5850. Here, Debtor contends that it is obligated to assume substantially all such obligations. Specifically, Debtor is

---

**9.** Debtor also contends that its actions in entering into substantially all of the contracts for and in relation to the construction and equipping of the Hilton Wing is further proof that it is the true owner of the Hotels. In the context of IDA financing, however, such actions are not indicative of ownership because "lessees" under IDA leases routinely execute contracts expressly as the agent for the IDA. *See Postler & Jaeckle v. County of Monroe,* 153 Misc.2d 392, 582 N.Y.S.2d 328 (Sup.Ct.1992); *see also* SIDA Supp. Memorandum, filed September 11, 1992, at Ex. 3. (construction contract wherein Debtor is named as agent for SIDA) It is in this fashion that the benefitted company or developer may be exempted from paying sales taxes on purchases.

**10.** At oral argument on Debtor's motion for an order extending its time to assume or reject the Lease pursuant to Code § 365(d)(3), SIDA took the position, and the Court agreed, *see* Decision of 8/8/91, that the rent called for under the Lease was not merely $1.00 per anum as Debtor had contended, but rather specifically included, *inter alia,* payments to the mortgage holders. *See* Transcript of Hearing of July 16, 1991. The position taken by SIDA in that proceeding further supports the conclusion here that the lease was primarily intended to secure payment of the mortgages.

obligated to: i) pay all real property taxes, water and sewer charges, as well as other governmental levies and charges, *see* Lease § 3.1; ii) to provide insurance for the Hotels and the personalty located therein, *see* Lease § 5.1 and iii) to provide general liability insurance. *See* Lease § 5.2.

Although such indicia of ownership are relevant to the determination of whether a particular agreement constitutes a "true lease", the Second Circuit has cautioned that this factor should not be viewed in isolation, particularly in light of the common use of "triple net" leases. *See Rensselaer Polytechnic Inst., supra,* 936 F.2d at 751. Under the typical triple net lease, the "rent stated is 'net' to the landlord because the tenant takes responsibility for taxes, operating expenses and the like" assuring the landlord that he will receive the lease's stated profits, subject to no other expenses, save for typical income taxes. *Id.* Thus, where such indicia of ownership have been shifted to the lessee, an examining court must be careful to "look to the 'economic substance of the transaction and not its form,' ... when considering this factor, which depending on the transaction, may be susceptible to different interpretations." *Id.* (quoting *In re PCH Associates, supra,* 804 F.2d at 200).

While similar to a triple net lease in that the stated rent is net of any of the costs associated with the operation of the Hotels, the Lease substantially differs from the typical triple net lease. The primary difference is the nature of the rental payments which were structured primarily for the purpose of amortizing the amount due on the outstanding bonds, rather than, as would characterize a normal lease, to assure payment of a profit to SIDA stemming from Debtor's use and occupation of the Hotels. *See Rensselaer Polytechnic Inst., supra,* 936 F.2d at 751.

It is also apparent that the Lease was structured as such in order to secure certain tax advantages for the benefit of Debtor. Under New York law an IDA is not expressly authorized to make a loan of IDA monies. *See* Op.St.Comp. No. 82–360 (1982) (clarifying that Op.St.Comp., No. 79–279 (1979) stands only for the proposition that an IDA may loan the proceeds of monies obtained pursuant to a federal grant if to do so would be in furtherance of the IDA's purpose). However, typical IDA financing is structured as a lease agreement, *see* Op.St.Comp. No. 82–360 (1982); *Postler v. Jaeckle, supra,* 582 N.Y.S.2d at 329, in order to provide participating developers tax benefits that would otherwise be unavailable absent IDA participation. In this regard,

> [t]he Internal Revenue Code of the United States and the General Municipal Law of New York State make certain obligations of IDAs tax exempt. Due to this tax exemption, a lender does not have to pay income tax on its interest income and, therefore, can loan money at a reduced interest rate. State law also exempts IDAs from Mortgage recording tax, sales tax, and certain real property taxes, if certain procedures are followed. *These various tax exemptions are the tools used to encourage economic development and expansion.*

*Id.* (emphasis added).

Additionally, the mandatory buy-back provision for the nominal sum of $100.00 subsequent to payment in full of all of the bonds executed by Debtor, Ho–Syr and SIDA in connection with the Hotels, *see* Adv.Compl. Exhibit D, at § 20.1, is further indication that the Lease was in reality a means of securing repayment of the bonds, and was not intended to create a true lease for purposes of Code § 365(d)(4). *See* S.Rep. No. 989, 95th Cong., 2d Sess., 64, *reprinted in,* 1978 U.S.Code Cong. & Admin.News 5787, 5850; *see also In re Wingspread Corp., supra,* 116 B.R. at 923; *In re Opelika, supra,* 67 B.R. at 171.

Based on the foregoing analysis, it is clear that in executing the Lease, the parties " 'intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship.' " *Rensselaer Polytechnic Inst., supra,* 936 F.2d at 748 (quoting *In re PCH Associates, supra,* 804 F.2d at 200). Thus, the economic substance of the lease belies its true nature as

something other than a true lease for purposes of Code § 365(d)(4).

However, relying on a line of reasoning first adopted by the Eleventh Circuit, *see In re Martin Bros.*, *supra*, 796 F.2d 1435; *In re Shelby Motel Group, Inc.*, 914 F.2d 227 (11th Cir.1990), *vacated by*, 925 F.2d 1583 (11th Cir.1991) (case settled), SIDA and MHTC contend that the Lease must be construed as a true lease for purposes of Code § 365(d)(4) for three principal reasons: i) because of the substantial public purposes served by SIDA through the Lease; ii) the Lease constitutes a three party transaction which is not amenable to a two party analysis; and iii) because SIDA lacks the statutory authority to assume the status of a mortgagee. For the reasons stated below, the Court finds these arguments unpersuasive.

First, SIDA contends that its ability to act in furtherance of its vital public function, "to promote the economic welfare, recreation opportunities and prosperity ... and to actively promote, attract, encourage and develop recreation, economically sound commerce and industry", *see* N.Y.Gen. Municipal Law § 852, would be jeopardized if the Lease is determined not to be a lease. Specifically, SIDA contends, *inter alia*, that the transaction was structured as a lease to enable SIDA to replace a lessee who was in default or who otherwise failed to comply with the terms of the Lease. Here, SIDA alleges that in addition to Debtor's default in payment, Debtor has permitted the Hotels to physically deteriorate in violation of the terms of the Lease. Such deterioration, SIDA contends, not only hampers the Hotel's ability to attract patrons to downtown Syracuse, but also jeopardizes the success of the County of Onondaga's Convention Center project. SIDA contends, therefore, that "the Court must protect the rights that SIDA retained [under the Lease] so that SIDA can continue with its required purpose as it relates to the Hotel." *See* SIDA Memorandum of August 4, 1992, at p. 8.

██ While recognizing the role SIDA plays in fostering the economic well being of the City of Syracuse's downtown area,

there is nothing in the statute or legislative history which compels the conclusion that a party's motivation for entering into a particular lease, whether for commercial gain or otherwise, should have any relevance for purposes of Code § 365(d)(4). *See e.g., Rensselaer Polytechnic Institute*, *supra*, 936 F.2d at 749 (education oriented goals not relevant to Code § 365(d)(4) inquiry). Since Code § 365(d)(4) only applies to true leases, SIDA's public purpose for entering into the Lease, while by no means insignificant, is simply not a factor in a Code § 365(d)(4) analysis.

Next, SIDA and MHTC contend, that the economic realities test is not applicable to the Lease, in part, because the present transaction involves three parties, the rights of whom would not be adequately protected under the two party analysis of the *PCH* decision. This concern, adopted by the Eleventh Circuit, *see In re Martin Bros.*, *supra*, 796 F.2d at 1440, however, ignores the purposes served by Code § 365(d)(4).

In determining that Code § 365(d)(4) is restricted only to true leases, the Second Circuit reasoned that:

> As a whole, section 365 allows a ... debtor-in-possession, to reject or assume ... leases, based on a determination of whether they burden or benefit the bankrupt estate. Thus, ... leases that benefit the bankrupt are favored over contracts with other creditors. *If security transactions, loans and other financing arrangements can be couched in lease terms, and can thereby be assumed by the bankrupt estate, the 'lessor' gains a distinct advantage at the expense of other creditors without a concomitant benefit to the bankrupt estate.*

*In re PCH Associates*, *supra*, 804 F.2d at 200 (emphasis added).

██ Therefore, if the parties intended to create a relationship giving rise to rights and obligations other than those ordinarily arising between a landlord and a tenant, the interests thereby created are properly excluded from application of Code § 365(d)(4). Here, the transaction was

structured as a lease, in part, to comply with SIDA's enabling legislation, and as a means of securing payment of the bonds that were issued to finance the project. Thus, the relationship between SIDA and the Debtor falls outside of the scope of Code § 365(d)(4).

█ SIDA also contends that the Lease must be construed as a true lease because SIDA is not authorized to make a loan of bond proceeds. SIDA reasons, therefore, that because it lacks statutory authority to assume the status of a mortgagee, the parties intended to create a true lease. SIDA may not bootstrap its argument in this fashion. Thus, if SIDA acted outside of the scope of its authority, *then SIDA* and not the estate should be made to bear the responsibility for such an *ultra vires* act.

However, the Court's determination that the Lease falls outside of the scope of Code § 365(d)(4) does not inescapably lead to the conclusion that SIDA has assumed the "forbidden" status of mortgagee. Rather, the Court's determination is limited solely to the finding that Code § 365(d)(4) is not applicable to the transaction at bar. *See In re PCH Associates, supra,* 804 F.2d at 201; *Rensselaer Polytechnic Inst., supra,* 936 F.2d at 750. Moreover, the alleged "far-reaching, unintended and economically devastating", effects a decision that the Lease is not what it purports to be for purposes of Code § 365(d)(4) will have on IDA financing in the State of New York, *see, e.g.,* SIDA Memorandum of August 4, 1992, at p. 13 (loss of tax exempt status on existing bonds, inability to attract future lenders due to uncertainty as to ongoing tax exempt status of bonds, existing lessees may lose the benefit of favorable PILOT agreements, etc.), *see also,* MHTC Memorandum

of August 10, 1992, at p. 26–27, are nothing more than speculation.

Moreover, despite the concerns expressed by the Eleventh Circuit in the *In re Martin Bros.* and *Shelby Motel Group* decisions, the relevant inquiry concerning applicability of Code § 365(d)(4) should be limited to the relationship of the parties under their agreement. Here, the Court finds that the Lease contains characteristics that are attributable to both, a loan secured by the Hotels as well as a lease; to wit, the "purchase price" of the Hotels was the amount necessary to finance construction of the Hilton Wing, the "rent" was structured as the amount necessary to amortize the bonds issued, and the Debtor was required to buy the Hotels for nominal consideration subsequent to retirement of those bonds. On the other hand, SIDA retained the typical lessor's right to re-enter and take possession in the event of default, and owed Debtor the duty of quiet enjoyment of the premises.

Despite these unique characteristics, however, it is plainly apparent from the structure of the transaction taken as whole, in the context of the IDA financing scheme,[11] and in light of the legislative history of Code § 502(b)(6), which indicates that disguised financing transactions are not subject to the preferential treatment accorded true leases, *see Rensselaer Polytechnic Inst., supra,* 936 F.2d at 750, that this Court must conclude that the parties intended to create a relationship other than that ordinarily arising between a lessor and lessee. Thus, Code § 365(d)(4) is inapplicable.

Finally, MHTC contends that the analysis undertaken by the Bankruptcy Court in *In re Wingspread, supra,* 116 B.R. 915, compels the conclusion that the Lease is what it purports to be. In *Wingspread,*

---

**11.** Typical IDA financing is a "conduit" financing, wherein the financing necessary to commence a project is achieved through a:

'bond and mortgage' and 'sale and leaseback' transaction. The agency sells its bonds to a bond purchaser. With the funds that are the proceeds of that sale, the agency acquires title to the facility. To secure the bonds, the agency mortgages the acquired facility; thus, the 'bond and mortgage' transaction. The agency

leases the facility to the entity benefited by the financing and agrees to reconvey the facility for [nominal consideration such as] one dollar upon termination of the financing; thus, the 'sale and leaseback' transaction. The revenue stream under the lease is the amount necessary to amortize the bond [sic] and is assigned by the agency to the bond [sic] holder.

*Postler & Jaeckle, supra,* 582 N.Y.S.2d at 329.

Judge Brozman, held that certain leases of nonresidential property, situate in Ohio and Indiana respectively, and leased from state industrial development agencies, were not "true" leases. Focusing on the distinction between state statutes that permit IDA's to lend money and those that do not, Judge Brozman found that there was no state law prohibition against construing the leases as financing vehicles, nor any state law decisions holding that such transactions must be determined to be leases. *See In re Wingspread, supra,* 116 B.R. at 921–22. In that case, however, Judge Brozman was careful to note that she was not holding the *Martin* approach to be the law in this Circuit, stating rather; "it is simply unnecessary to consider [the propriety of *Martin*] in light of the applicable state's laws." *Id.* 116 B.R. at 922 n. 9.

However, this Court has determined that the proper application of Code § 365(d)(4) requires an inquiry into the relationship of the parties under an agreement which they have chosen to denominate as a lease. *See* Discussion *supra.* Because the economic substance of the Lease belies its true nature as a financing vehicle, the *Wingspread* decision supports the conclusion that the Lease is not a true lease for purposes of Code § 365(d)(4). *See id.* 116 B.R. at 923.

### E. THE EXECUTORY CONTRACT ARGUMENT

 In the alternative, SIDA contends that based on certain outstanding obligations of both SIDA and Debtor remaining due under the Lease, the agreement constitutes an executory contract which the Debtor must assume or reject under Code § 365(a).

 An executory contract is one under which performance remains due to some extent on both sides. *See In re Streets & Beard Farm Partnership,* 882 F.2d 233, 235 (7th Cir.1989) (citing S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978) and H.Rep. No. 595, 95th Cong. 1st Sess. 347 (1977), *reprinted in,* 1978 U.S.Code Cong. & Admin.News, 5787, 5844, 5963, 6303). To be considered executory, the performance re-

maining due must be significant such that the failure of either party to complete performance would constitute a material breach excusing the performance of the other party. *Id.* (citing Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn.L.Rev. 439, 460 (1973)); *In re Wedtech Corp.,* 72 B.R. 464, 474 (Bankr. S.D.N.Y.1987). *But see In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 687, 708–09 (Bankr.S.D.N.Y.1992) (rejecting the Countryman test in favor of the "functional definition" of executory contracts as discussed in Westbrook, *A Functional Analysis of Executory Contracts,* 74 Minn.L.Rev. 227 (1989) and Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook,* 62 U.Colo.L.Rev. (1991)).

 Security agreements are generally regarded as non-executory within the meaning of Code § 365. *In re Pacific Express, Inc.,* 780 F.2d 1482, 1487 (9th Cir. 1986); *Jenson v. Continental Financial Corp.,* 591 F.2d 477, 482 (8th Cir.1979) (holding that a security agreement was not executory under the Bankruptcy Act). Thus, where one party has already completed or substantially completed performance, *e.g.,* by delivering possession of goods or property and holds legal title in trust solely to secure payment of the amount financed, and the only substantial obligation for the receiving party is to complete payment, the contract is not executory for purposes of Code § 365. *See In re Pacific Express, Inc., supra,* 780 F.2d at 1487–88; *cf. In re Chateaugay Corp.,* 102 B.R. 335, 344–45 (Bankr.S.D.N.Y.1989) (a contract is not executory when the only obligation of a party to the contract is the payment of money). Such is the case here. Financing for the construction of the Hilton Wing and improvements to the Hotel having been completed, essentially Debtor needed only to complete payment of the amount financed in order to reacquire fee title to the Hotels for the nominal sum of $100.00.

Additionally, SIDA contends that the existence of continuing obligations of both SIDA and Debtor under the Lease are in-

dicative of its nature as an executory contract. These include SIDA's obligation:

1) to reimburse the lessee in the event the lessee is required to pay a levy or tax for which the lessor is responsible ... 2) to pay or cause to be paid out of insurance funds, payments to contractors, materialmen, etc ... 3) to adjust the rent in the event the property is partially condemned ... 4) subject to the condition that the lessee pay its rent, to provide quiet enjoyment of the premises ... 5) after payment of the mortgages, to sell the premises and personalty and provide good title of the property to the lessee.

*See* SIDA Memorandum filed August 4, 1992, at p. 18.

However, none of these obligations are of such significance that SIDA's failure to perform would constitute a material breach of the agreement under the well recognized Countryman test outlined above.

While SIDA also contends that the agreement should be construed as a contract for the sale of real property and is thus executory, the Court has already concluded that the Lease constitutes an agreement in the nature of security, *see* Discussion, *supra,* and is, therefore, not an executory contract within the meaning of Code § 365(a). *See In re Pacific Express, Inc., supra,* 780 F.2d at 1487.

Based on the foregoing conclusions it is hereby

**ORDERED** that Debtor's motion seeking summary judgment on the issue of whether the Lease is a true lease within meaning of Code § 365(d)(4) is granted, and it is further

**ORDERED** that Debtor is entitled to a declaratory judgment that the Lease is not a true lease within meaning of Code § 365(d)(4), and it is further

**ORDERED** that SIDA and SEDCO's cross-motion seeking summary judgment is denied.