**In re The SECURITIES
GROUPS, Debtor.**

**Bankruptcy No. 84–430–BK–J–GP.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

June 28, 1990.

See also, Bkrtcy., 118 B.R. 114.

George E. Ridge, Jacksonville, Fla., for post-confirmation adm'r, Louis Lowin.

Robert L. Young, Orlando, Fla., Ira Rubin, Dayton, Ohio, Roy Babitt, Michael B. Kaplan, New York City, for objectors.

James A. Howell, Edwin W. Held, Jr., Jacksonville, Fla., for claimant.

Glenn B. Rice, New York City, for creditors' committee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO OBJECTIONS TO CLAIM NO. 207

GEORGE L. PROCTOR, Bankruptcy Judge.

This case is before the Court upon objections to the Federal Deposit Insurance Corporation's ("FDIC") claim number 207 in the amount of $7,014,103.00. Objectors are the post-confirmation administrator, Louis Lowin; Dayton Securities Associates; PM Associates; Litchfield Associates; Falls Village Associates; and a group of objectors represented by the law firm of Carlton, Fields, Ward, Emmanuel, Smith and Cutler, P.A. ("objectors").

Upon the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Debtor, The Securities Groups ("Groups") is a New York partnership conducting business in New York, New York, whose general partners were The Monetary Group ("TMG"), The Securities Group ("TSG"), and The Securities Group 1980 ("TSG80").

2. Groups was formed in 1980 as a government securities trading partnership to conduct the activities of its constituent partnerships, with a goal to maximize the total return to the partners by utilizing tax sheltered transactions.

3. In early 1982, the management of Groups considered a number of changes in its operations and concluded that it would diversify by acquiring an interest in one or more savings and loan associations.

4. In September 1982, Groups negotiated for the purchase of all of the capital stock of Southern California Savings and Loan Association ("SoCal") from City Investing Company ("City"). Groups and City executed a written purchase agreement scheduling the terms of Groups' acquisition of the capital stock of SoCal.

The purchase agreement provided for Groups to pay City an aggregate of $27 million as follows: $9.4 million at closing (representing $7 million of the principal and $2.4 million of prepaid interest on the unpaid balance) and a promissory note for the unpaid balance of $20 million.

5. Although the purchase agreement allowed Groups to nominate National Trust Group ("NTG") to hold SoCal's stock, it did not release Groups from its obligation to pay the balance of the purchase price. Groups remained a primary obligor on the purchase agreement and was jointly and severally liable with NTG. The execution of the purchase agreement was authorized by Groups and it represented to City that it had the authority to purchase, accept and take delivery of all the shares of guaranteed capital stock of SoCal.

6. On November 15, 1982, an application was made jointly by Groups, TSG, TMG, and TSG80, the Ameribond Securities Associates, NTG, and Finance Limited Partnership for approval of the Federal Home Loan Bank Board ("FHLBB") on behalf of the Federal Savings and Loan Insurance Corporation ("FSLIC") for the acquisition of SoCal's stock, pursuant to § 408(e)(1)(B) of the National Housing Act. This was necessary since SoCal's deposit accounts were insured by FSLIC.

7. The attorneys for Groups, NTG and the other applicants elected to submit the application to the San Francisco office of the Federal Home Loan Bank Board. The purpose in submitting the application to a regional office of the Bank Board was to obtain "delegated approval" which could be obtained in a much shorter time period. However, in order to obtain early approval of the application, federal regulations required that the joint applicants agree to maintain the institution's regulatory capital at required levels.

On December 7, 1982, the joint applicants submitted Amendment No. 5 to the application. Subpart (b) of the amendment provided in relevant part:

The Applicants hereby stipulate to the Corporation [FSLIC] that as long as they control Southern California Savings and Loan Association, the Applicants will cause the net worth of Southern California Savings and Loan Association to be maintained at a level consistent with that required by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts, as now or hereafter in effect for institutions insured for 20 years or longer and, as necessary, will infuse sufficient additional equity capital, in a form satisfactory to the supervisory agent, to effect compliance with such requirement.

8. The supervisory agent, as an incident to approval, was required to determine that the company acquiring the insured institution had sufficient financial and managerial resources. In making the evaluation, the supervisory agent is required to consider the financial and managerial resources of the company acquiring stock of the institution as well as it subsidiaries and affiliates.

In the application, the joint applicants represented that Groups was one of the ten best capitalized securities firms in the nation with over $364 million of net subscribed equity capital and that most of the funds for the acquisition would come from Groups.

9. On December 14, 1982, the application to acquire SoCal's stock was approved, subject to several conditions set forth in a letter from Thomas F. Sharkey to Charles Atkins ("Atkins"), managing partner of Groups. One of the conditions outlined in the letter dealt with maintenance of net worth:

The applicants will cause the net worth of Southern California Savings and Loan Association to be maintained at a level consistent with that required of institutions insured 20 years or longer by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts, as now or hereafter in effect, and where necessary, will infuse sufficient additional equity capital to effect compliance with such requirements.

10. The transaction closed on December 23, 1982. Groups appointed NTG as its designee to take all of the shares of SoCal's stock. NTG delivered a promissory note payable in one year to City in the amount of $20 million. Initially, NTG's promissory note was secured by SoCal's stock, which was pledged to a trustee for the benefit of City. Between December 23, 1982, and January 30, 1983, Groups loaned NTG sufficient cash or government securities to allow NTG to pledge government securities in place of SoCal's stock as security for $13,172,000.00 of the $20 million promissory note to City.

11. Soon after the acquisition, SoCal fell below its required regulatory net worth. SoCal acknowledged the deficiency and represented to the regulators and auditors that the deficiency would be cured by SoCal's holding company, NTG. The individuals making these representations were directors of both SoCal and NTG.

12. On March 11, 1983, City and NTG agreed that the $20 million promissory note given on December 23, 1982, would be cancelled and replaced by two promissory notes made by NTG in favor of City, one for $13,172,000 and the other for $6,828,000. The promissory note made by NTG in favor of City for $13,172,000 was secured by a letter of credit issued by Lloyds Bank International Limited ("Lloyds") on behalf of NTG. City returned the $13,172,000 in government securities which had been pledged to secure NTG's $20 million promissory note. On March 11, 1983, NTG entered into a letter of credit agreement with Lloyds. Pursuant to that agreement, Lloyds issued an irrevocable letter of credit to City for an amount not to exceed $13,172,000.00 at the request of NTG.

13. NTG's obligation to Lloyds under the letter of credit agreement was secured by a pledge of the SoCal stock and guarantees executed by Groups and Finance Limited Partnership. The guarantees were executed concurrent with the letter of credit agreement. Pursuant to the terms of the guaranty, Groups and Finance Limited Partnership agreed to pay, jointly and severally, all amounts payable by NTG under the letter of credit agreement when due. The guaranty agreement allowed Lloyds

the right to proceed against either guarantor without exhausting any other remedies.

14. NTG went into default under the letter of credit agreement in April, 1983. As consideration for not declaring the agreement in default, Lloyds required an immediate payment of $3.25 million, and on May 13, 1983, Groups wire-transferred $3.25 million directly into Lloyds' account at Morgan Guaranty Bank.

In July, 1983, Lloyds advised NTG and Groups that they were in default of certain non-monetary covenants regarding the net worth requirements and threatened to sell the SoCal stock pledged collateral for the letter of credit. To prevent such a sale, NTG agreed to seek a buyer for the SoCal stock. NTG was unable to conclude the sale.

15. In 1983, SoCal lost money in every month except June. By the end of November 1983, SoCal had a regulatory net worth deficiency of $17.3 million. Among other things, this deficiency prevented SoCal from obtaining short-term loans from the Federal Home Loan Bank of San Francisco.

16. On December 15, 1983, Atkins attended a meeting of SoCal's board of directors and proposed an exchange of assets and liabilities between SoCal and NTG. The purpose of the exchange, as presented by Atkins, was to increase the net worth of the association and move toward compliance with the association's regulatory net worth which was inadequate.

17. Section 408(d)(6)(A) of the National Housing Act required FSLIC's prior written approval before a savings and loan association could "engage in any transaction with any affiliate involving the purchase, sale, or lease of property or assets." The form of application for approval of such transaction is specified in 12 CFR §§ 584.3(f) and 584.10(c). Federal regulations required that the application be submitted on form H–(d)2 to the Federal Home Loan Bank Board in Washington, D.C., and to the supervisory agent in the institution's district. No application was submitted by SoCal.

18. On December 22, 1983, two agreements were executed. The first agreement transferred from Groups and Atkins to NTG all of the assets described by Atkins to SoCal's board of directors except the savings and loan industry analysis. The second agreement, entitled "Contribution Agreement," transferred some of those assets and the savings and loan industry analysis to SoCal, or SoCal's subsidiary, Continental Development Corporation.

19. The contribution agreement was formally approved by SoCal's board of directors at a meeting on December 23, 1983. According to Ernest Luchsinger, a member of SoCal's board and chief financial officer, the major consideration in favor of the proposal was SoCal's need for an increase in net worth. SoCal was the intended beneficiary of Groups' transfer of assets to NTG.

20. On December 23, 1983, pursuant to the contribution agreement, SoCal advanced funds to Continental Development Corporation in the amount of $13,172,000 for the purpose of facilitating payment to Lloyds. Luchsinger confirmed the amount with Lloyds prior to payment. SoCal paid $13,172,000 to an account maintained by Lloyds on December 23, 1983. After receiving the funds from SoCal, Lloyds transferred $13,172,000 to an account maintained by City. City accepted the payment by Lloyds in satisfaction of the promissory note in that amount due from NTG to City. City returned the letter of credit to Lloyds, which Lloyds cancelled, and also returned NTG's promissory note in the amount of $13,172,000, which NTG later marked "cancelled." Lloyds returned the shares of SoCal stock which had been pledged for the letter of credit to NTG on January 3, 1984.

21. The assets described in the contribution agreement had little value to SoCal. The assets failed to contribute to SoCal's capital for economic reasons. Most of the assets were non-performing at the time of transfer and there is little evidence that SoCal obtained title or any legally enforceable right to most of the assets.

Prior to the filing of this litigation, SoCal made demand, without success, on Groups for payment of $13,172,000.

22. On May 25, 1984, Groups, TMG, TSG, TSG80, and Atkins filed cases under Chapter 11 of the Bankruptcy Code. On November 1, 1984, SoCal filed Proof of Claim No. 207 in the Groups estate.

23. On June 6, 1985, the Federal Home Loan Bank Board appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") as receiver for SoCal, and on June 7, 1985, FSLIC took possession. So-Cal assigned to FSLIC the proofs of claim in the estates of Groups and Atkins. FSLIC assisted in the incorporation of Southern California Federal Savings and Loan Association ("SoCal Federal") and transferred substantially all of SoCal's assets and liabilities to SoCal Federal with the exception of claims, causes of action and proceedings against directors, officers, controlling persons and affiliates of SoCal and its subsidiaries which were retained by FSLIC.

24. FSLIC brought two lawsuits against former directors and officers of SoCal, *FSLIC v. Loeffler* and *FSLIC v. Huang*. Damages attributable to the asset contribution represented 32 percent of the total damages claimed by FSLIC against the *Loeffler* defendants ($14 million of $43.5 million).

On March 25, 1988, the parties to the *Loeffler* action and Harbor Insurance Co. entered into a settlement agreement. Harbor Insurance Co. paid FSLIC $10,875,000 to dismiss all claims against the *Loeffler* defendants and to dismiss an unrelated claim against Hubert Laugharn. The written settlement agreements executed by the parties did not allocate the amount paid in settlement among the individual defendants dismissed as a result of the settlement. Counsel for defendants who negotiated the agreement expressly declined to allocate the settlement among claims or defendants, leaving the allocation to FSLIC.

In connection with the *Loeffler* litigation, FSLIC paid $1.8 million to attorneys, experts, and consultants for fees and expenses in the litigation.

There is a credit against Claim No. 207 in the amount of $2,920,688 as a result of the FDIC's allocation of payments received in settlement of the *Loeffler* litigation.

25. FSLIC was assigned SoCal's interest in a lawsuit brought by the law firm of Naegele & Sanders. The claims relating to the contribution agreement represented 96 percent of the damages alleged by SoCal in the counterclaim against Naegele & Sanders.

On January 5, 1989, Mr. Naegele, Mr. Sanders and FSLIC entered into three separate settlement agreements resulting in dismissal of the entire action. FSLIC received a balance of $4.6 million in exchange for dismissal of the action and release of Mr. Naegele and Mr. Sanders. The $4.6 million was not allocated by Mr. Naegele and Mr. Sanders among various claims asserted in the counterclaim in that action. FSLIC expended $1.2 million in legal fees, expert witness fees and other expenses of litigation.

There is a credit against Claim No. 207 in the amount of $3,258,000, as a result of the FDIC's allocation of amounts paid in settlement of the *Naegele & Sanders* litigation.

26. FSLIC was assigned SoCal's interest in an existing lawsuit brought by SoCal against SoCal's former holding company, City Investing Company and assumed control of that litigation in 1985.

27. Claim No. 207 seeks payment of damages from the breach of a tax-sharing agreement in the amount of $6,828,000. FDIC acknowledges a credit against Claim No. 207 in this amount which FSLIC recovered from City Investing Company Liquidating Trust.

In addition to the amount paid by City Investing Company Liquidating Trust to settle the tax-sharing claim, City paid an additional $500,000 to FSLIC in settlement of a claim that City and its officers participated in "looting" of SoCal. The "looting" claim related in part to the contribution agreement transaction. FDIC acknowledges an additional credit of $500,000 against the amount owed on Claim No. 207.

28. In 1986, FSLIC filed a claim in the estate of NTG in the amount of $25 million.

That claim is based upon the contribution agreement and several other transactions.

29. The amount remaining unpaid on Claim No. 207 is $7,014,103.

## CONCLUSIONS OF LAW

The promises made by Groups, NTG and others in their initial application to acquire SoCal and in the two written agreements executed on December 22, 1983, must be read together as a single promise to transfer additional equity capital to SoCal and its subsidiary. California Civil Code § 1642.

■ A contract made expressly for the benefit of a third person may be enforced by the third party in a direct action against the promisor. California Civil Code § 1559. The presence of a third party beneficiary to a contract may be determined either from the express language of the contract or in light of the circumstances under which the contract was executed. *Ralph Sutro v. Paramount*, 216 Cal.App.2d 433, 437, 31 Cal.Rptr. 174 (1963). In this litigation, both the language of the contracts and the circumstances of the transfer establish that SoCal and its subsidiary were the intended third party beneficiaries of the transfer of assets from Groups to NTG. The purpose of that transfer was to contribute to SoCal's capital and to fulfill Groups' agreement to maintain SoCal's required net worth.

Groups was liable to SoCal, and is now liable to FDIC as successor, for breach of the net worth maintenance agreement and contribution agreements.

NTG's tender of promissory notes to City in 1982 and 1983 did not extinguish Groups' obligation under the purchase agreement with City. That obligation could only be extinguished by agreement in writing by City. N.Y.Gen.Oblig. § 15–501.

■ A party who by contract pays the debt of another is a surety. This is the law in New York, which governs the purchase agreement by its terms, and in California, which governs the contribution agreement by its terms. *See, Abrams v. United States*, 797 F.2d 100, 103–04 (2nd Cir.1986); California Civil Code § 2787. SoCal was a surety of Groups and NTG with respect to their obligations to Lloyds and City since SoCal satisfied both debts. With respect to the debt to Lloyds, it was subrogated to the rights of the creditor (Lloyds) and became entitled to enforce every remedy which the creditor had against the principal (NTG) and against all co-sureties (Groups and Finance Limited Partnership). Similarly, when SoCal satisfied the obligation to City, it was subrogated to the rights of City against the co-obligors, Groups and NTG. California Civil Code § 2848; 63 N.Y.Jur.2d § 498.

To the extent that SoCal was not fully compensated for the payment of the debts to Lloyds and City, SoCal may enforce the rights of Lloyds and City against Groups. (It would be inappropriate in this litigation for the Court to make a binding ruling as to NTG.) There is no requirement that SoCal proceed in any order in enforcing these obligations. They are joint and several.

■ A contract made in contravention of a federal or state statute is unlawful and is void. California Civil Code §§ 1550, 1598 and 1667. Ordinarily, an illegal contract may not be enforced by either party. However, the courts will allow the remedy of restitution to prevent a forfeiture which is contrary to the policy of the statute.

■ In the case at bar, allowing Groups to retain the benefit of SoCal's payment of its debt to City would improperly reward Groups for a transaction which was illegal under Section 408(d)(6)(A) of the National Housing Act, 12 U.S.C. § 1730a(d)(6)(A). Given a choice between bestowing an illegal benefit upon Groups and allowing a federal agency to recover some of its deposit insurance loss, the Court opts to allow FDIC to recover restitution on behalf of SoCal.

Section 408(d)(1) of the National Housing Act prohibits an insured savings and loan association from investing "any of its funds in the stock, bonds, debentures, notes, or other obligations of any affiliate...." 12 U.S.C. § 1730a(d)(1). The

term "affiliate" is broadly defined to include any person or company "which controls, is controlled by, or under common control with" the insured savings and loan association. 12 U.S.C. § 1730a(a)(1)(I).

The following assets listed in the contribution agreement were "obligations of affiliates" within the meaning of § 408(d)(1) of the National Housing Act: the general partners receivable, the Finance Limited Partnership receivable, The Leasing Group receivable, and the 36 West 44th Street asset consisting of stock in Legal Facilities Management. An investment in the obligation of an affiliate cannot be recorded as an asset of the association and does not count toward the association's net worth.

■ The federal common law rules regarding application of payments require that money be applied against multiple obligations in accordance with the intention of the debtor. These rules apply to payments made in settlement of federal litigation. If the debtor fails to specify an allocation, the creditor may apply the payments as it deems appropriate. *FSLIC v. Transamerica Insurance Company,* 661 F.Supp. 246, 252–53 (C.D.Cal.1987); *FDIC v. Freudenfeld,* 492 F.Supp. 763, 770 (E.D.Wis. 1980). The creditor's action to recover on remaining debts or items is evidence of the creditor's allocation of payments already received. However, if neither the debtor nor the creditor allocates the payments, the court will allocate the payments among different debts in accordance with justice and equity in order to protect and maintain the rights of both debtor and creditor. *First National Bank in Palm Beach v. United States,* 591 F.2d 1143, 1147 (5th Cir.1979).

■■ A party injured by breach of contract is under a duty to make reasonable efforts to mitigate damages. The party's reasonable expenses in attempting to mitigate damages, whether successful or not, are recoverable as consequential damages against the debtor. *Goodpasture, Inc. v. M/V Pollux,* 688 F.2d 1003, 1008 (5th Cir. 1982); *Reynolds Metals Co. v. Lampert,* 316 F.2d 272, 275 (9th Cir.1963).

FDIC's Claim No. 207 is presumed valid and is prima facie evidence of the validity of both the claim and its amount. The burden is on the objecting party to sustain each objection to the claim, and the debtor has the burden to overcome the prima facie correctness of the claim. However, the burden of ultimate persuasion by the preponderance of the evidence rests with the claimant. *In re St. Augustine Gunworks, Inc.,* 75 B.R. 495 (Bankr.M.D.Fla.1987). In this case the FDIC has met its burden of proof concerning Claim No. 207.

CONCLUSION

The Court will enter a separate order in accordance with these Findings of Fact and Conclusions of Law allowing Claim No. 207 in the amount of $7,014,103.00.