In re Hanimi R. CHALLA, and Jamuna Challa, Debtors.

Bankruptcy No. 92–2124–3P1.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Sept. 11, 1995.

Robert Altman, Palatka, FL, for debtors.

Lance P. Cohen, Jacksonville, FL, for Beverly Hills Medical Park.

GEORGE L. PROCTOR, Bankruptcy Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case came before the Court upon debtors' objection to claim 34 filed by Beverly Hills Medical Park, Inc. (BHMP or medical park). Upon the evidence presented at hearings held on August 4, 1994, November 22, 1994, and February 22, 1995, the Court enters the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Debtor, Dr. Hanimi Challa (Dr. Challa or Challa), is a physician specializing in geriatric medicine in Marion County and Citrus County, Florida.

2. In 1986, debtors purchased a 34 acres of undeveloped land in Citrus County, Florida and subdivided the land into seven smaller parcels. (Tr. Vol. I at 17).

3. Debtors sold 4.4 acres of land to a partnership (the partnership) comprised of debtors, owning fifty percent of the partnership; Dr. Venugopala A. Reddy and his wife, owning twenty-five percent of the partnership; and, Dr. Padma V. Reddy and her husband, owning twenty-five percent of the partnership. (Tr. Vol. I at 17).

4. The partnership attempted to develop a medical park on the property and on November 10, 1988, the partnership borrowed $800,000 from First Florida Bank, N.A. (First Florida) to construct the first medical park building. (Debtors' Ex. 1).

5. On August 4, 1989, BHMP was incorporated as a Florida for profit corporation. At the time of incorporation, the principal shareholders were Dr. Hanimi Challa, Jamuna R. Challa, Venugopala Reddy, and Saraswathi Reddy. (Debtors' Ex. 2).

6. On August 31, 1989, the partnership transferred the 4.4 acre parcel of land to BHMP. (Debtors' Ex. 3).

7. At the time of the transfer, one office building had been constructed on the property and was occupied by Challa's Citrus and Marion Geriatrics Associates, P.A., Gulf Coast Physical Therapy, and Dr. Sol Anker. (Tr. Vol. I at 31).

8. Challa's Citrus and Marion Geriatrics Associates, P.A. (the P.A.) was incorporated on September 3, 1987, (Debtors' Ex. 4), and Dr. Challa was the sole shareholder of the corporation. (Tr. Vol. I at 26). Dr. Hanimi Challa, Dr. Venugopala Reddy, and Dr. Padma Reddy served as officers of the corporation. (Tr. Vol. I at 26).

9. Debtor, Dr. Hanimi Challa, entered into an employment agreement with the P.A. on September 18, 1988. (Debtors' Ex. 5). Challa signed the employment agreement both as an individual and as the president of the P.A.. (Tr. Vol. I at 27).

10. Challa's P.A. first occupied space in the medical park in July, 1989. (Tr. Vol. I at 44).

11. On April 14, 1992, the debtors filed for relief under Chapter 11 of the Bankruptcy Code.

12. On November 9, 1992, BHMP filed claim 34 in the amount of $428,953.41. The claim included $188,770.75 for prepetition rent; $17,786.39 for prepetition interest on rent; $47,938.56 for damages for breach of

lease (1 year's rent); and $174,457.71 for conversion of corporate funds.

13. Debtors filed an objection to claim 34, alleging that the P.A. made irregular lease payments to BHMP and, in lieu of rent, loaned money to BHMP and paid expenses on its behalf. Debtors also demanded a right to setoff against BHMP's claim.

## CONCLUSIONS OF LAW

### I. Validity and Amount of Claim for Prepetition Rent and Lease Rejection Damages

#### A. Validity of Claim for Prepetition Rent

■ A properly filed proof of claim is presumed valid and prima facie evidence of both the claim and its amount. *In re McCoy*, 163 B.R. 206, 209 (Bankr.M.D.Fla.1994). *See In re St. Augustine Gun Works, Inc.*, 75 B.R. 495, 499 (Bankr.M.D.Fla.1987), and *In re The Securities Groups*, 116 B.R. 839, 845 (Bankr. M.D.Fla.1990). Unless an interested party objects, a claim is allowed as filed. *In re Haack*, 165 B.R. 501, 502 (Bankr.M.D.Fla. 1994). *See In re Brinson*, 153 B.R. 952, 954 (Bankr.M.D.Fla.1993), and 11 U.S.C. § 502(a). The debtor bears the burden of overcoming the presumed validity of the claim with affirmative proof. *In re St. Augustine Gun Works, Inc.*, 75 B.R. 495, 499 (Bankr.M.D.Fla.1987). If, however, the debtor overcomes the presumed validity of the claim, or if the claim was incorrect when filed, the claimant must establish the validity and amount of the claim. *In re Haack*, 165 B.R. 501, 503 (Bankr.M.D.Fla.1994). *See In re McCoy*, 163 B.R. 206, 209 (Bankr.M.D.Fla. 1994). Thus, the "burden of ultimate persuasion by the preponderance of the evidence rests with the claimant." *In re The Securities Groups*, 116 B.R. 839, 845 (Bankr. M.D.Fla.1990).

Claim 34 is essentially composed of a claim for prepetition rent and damages resulting from an alleged lease agreement between Dr. Challa and BHMP, and a claim for conversion of corporate funds charged against Dr. Challa. The Court will examine each portion of the claim before evaluating the debtors' right to set off.

In open Court, BHMP itemized this portion of its claim as follows:

| | |
|---|---:|
| Prepetition rent | $147,107.00 |
| Sales tax on prepetition rent | 8,826.42 |
| Common area maintenance charges (CAM) | 14,160.00 |
| Sales tax for CAM charges | 845.60 |
| Rejection for lease rent damages | 48,234.70 |
| Rejection for lease CAM damages | 4,000.00 |
| Sales tax on rejection damages | 3,139.06 |
| TOTAL: | $226,311.48 |

(Tr. Vol. II at 279–81).

■ BHMP's new calculations for this portion of the claim differ substantially from those itemized in the original proof of claim. Thus, BHMP bears the burden of proving both the validity and the amount of the claim. *In re Haack*, 165 B.R. 501 (Bankr.M.D.Fla. 1994).

■ BHMP's claim for prepetition rent and lease rejection damages is premised on an alleged lease between Challa and BHMP. Both the origin and the validity of the lease are in dispute. The Court received into evidence a copy of a lease which names Dr. H. Challa, M.D. as the lessee and Beverly Hills Medical Park, Inc. as the lessor. The lease was signed by Harriette Rolnick, as President of BHMP, Bhupendra Gupta, and Hanimi H. Challa. (Claimant Ex. 1). The Court also heard testimony from Gaston Hall, the project manager and general contractor for the medical park buildings. Hall stated that Dr. Challa "whited-out" the name on a copy of a lease and penciled in his own name. According to Hall, Challa also wrote in the term of the lease and the monthly rental value. Challa then gave the lease, with his handwritten changes, to a secretary to have the handwritten information typed onto that lease. (Tr. Vol. II at 271). Hall further testified that Challa reviewed the typed copy of his name, and entered the handwritten initials "M.D." after his name. The copy of the lease in evidence contains handwritten initials "M.D." after Dr. Challa's typed name. (Tr. Vol. II at 272–73). Hall also testified that Challa submitted the lease to First Florida Bank as part of a loan approval package in late 1989. (Tr. Vol. II at 334).

In contradiction to Hall's testimony, Challa testified that neither he nor his P.A. signed a lease with BHMP. (Tr. Vol. I at 39). Al-

though BHMP claims that the lease in evidence binds Challa, Challa argues that the signature page on that lease was actually copied from a lease between BHMP and Bhupendra Gupta, which Challa signed as a witness.

The Court received the deposition of Dr. Bhupendra Gupta into evidence. (Debtors Ex. 41; Tr. Vol. II at 251). According to Gupta, the signature page on his lease is also attached to the alleged Challa lease. (Debtors' Ex. 41 at 9). Gupta and Challa signed two originals of Gupta's lease in April 1990. Gupta's lease was also signed by Harriette Rolnick in her capacity as President of BHMP. (Tr. Vol. I at 35). Rolnick's signature is not dated. Rolnick became President of BHMP in October, 1989. (Tr. Vol. I at 35, 37).

■ The alleged Challa lease was dated March 29, 1989. (Claimant Ex. 1). While it is possible that this lease could have been signed by Harriette Rolnick after October 1989, the lease could not have been included in the loan package to First Florida in late 1989 because Gupta and Challa did not sign the lease until April 1990. According to the testimony of a bank officer, neither the Gupta lease nor the alleged Challa lease was contained in the bank file. (Debtors' Ex. 42, Tr. Vol. II at 260–61). In court, BHMP offered a facsimile copy of a lease allegedly faxed to Mr. Cohen's office from First Florida. In light of the bank officer's testimony and absent means of authenticating the faxed copy, the Court finds it inappropriate to consider the copy of the alleged Challa lease as a part of the bank file. (Claimant Ex. 23).

Gupta testified that he signed two originals of his lease, but he never signed another document with Dr. Challa. (Debtors' Ex. 41 at 8). Thus, Gupta's signature should not appear on a Challa lease.

The Court has reviewed the testimony surrounding the alleged lease with Challa, as well as the exhibits purporting to be copies of the document. (Claimant's Ex. 1, Claimant's Ex. 23, Debtors' Ex. 3). The Court finds the authenticity of the alleged lease with Challa to be suspect, and BHMP cannot rely on the lease to establish the validity or the amount of its claim for prepetition rent or lease rejection damages.

■ The Court, however, finds that BHMP does have a valid claim for prepetition rent pursuant to Challa's testimony regarding a verbal lease agreement he negotiated with BHMP on behalf of his P.A. According to Challa's testimony, his P.A. agreed to pay $3,500 per month plus sales tax to BHMP for lease of 5,000 square feet of office space in the medical park. (Tr. Vol. I at 43). Pursuant to Challa's testimony, tenants were not required to pay rent for the first six months. (Tr. Vol. I at 44). This testimony is corroborated by the testimony of Bhupendra Gupta. (Debtors' Ex. 41 at 14).

*B. Amount of Claim for Prepetition Rent*

The validity of claim 34 having been established by this evidence, the Court must now determine the amount of the claim pursuant to 11 U.S.C. § 502(a). Section 502(a) states:

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under Chapter 7 of this title objects. (b) Except as provided in subsections (e)(2), (f), (g), (h), and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim....

11 U.S.C. § 502(a).

■ Pursuant to Challa's testimony, his P.A. was responsible for rent payments beginning in January, 1990. (Tr. Vol. I at 44). Thus, BHMP's claim for prepetition rent would be for the 28–month period between January, 1990, and April, 1992. At the confirmation hearing in this case, the Court awarded administrative rent to the claimant. In making this award, the Court found that Challa's P.A. actually only occupied 2,500 square feet of the medical park, as opposed to the 5,000 square feet suggested by the claimant. (Claimant's Ex. 38 at 11—12). Consistent with its earlier ruling, the Court finds that the claim for prepetition rent should also be based on the use of 2,500

square feet. Challa, therefore, should only be responsible for rent representing the value of the space he actually used. The Court finds the rental value of the property to be $1,750 per month.

The sales tax for Volusia County, Florida is six percent. (Tr. Vol. II at 279). Thus, upon the evidence presented, the Court finds the debtors' total rental obligation, including sales tax, for the 28-month prepetition period is $51,940.

■ In court, Challa offered evidence of rent payments made to BHMP which should be credited toward the amount of prepetition rent due. Debtors offered eleven exhibits representing a total of $22,940 that they claim was paid to BHMP for rent. (Debtors' Ex. 13a–13k; Tr. Vol. I at 45–51). Debtors' Exhibits 13f–13j were copies of checks totalling $5,200. The debtor offered no additional evidence to prove that these checks were delivered to or negotiated by BHMP. Thus, the Court finds that only Debtors' Exhibits 13a–13e and 13k may be utilized for purposes of calculating the amount of Challa's credit against prepetition rent due to BHMP. The Court finds that Challa may credit $17,740 against the prepetition rent due and the Court will allow BHMP's claim for prepetition rent in the amount of $34,200.

■ BHMP's claim also included claims for common area maintenance charges, common area maintenance rejection damages, lease rejection damages, and sales tax on the rejection damages. Although the alleged written lease contained provisions obligating Challa to pay common area maintenance fees, Challa's verbal agreement with BHMP did not contain this provision. The Court finds that BHMP is not entitled to common area maintenance fees, damages for the rejection of those fees, or any applicable sales tax.

### C. Validity of Claim for Lease Rejection Damages

■ BHMP claims entitlement to lease rejection damages pursuant to 11 U.S.C. § 502(B)(6). "The purpose of § 502(b)(6) is to compensate the landlord for its loss while not permitting a claim so large as to prevent other unsecured creditors from recovering a dividend from the estate." In re Q–Masters, Inc., 135 B.R. 157, 159 (Bankr.S.D.Fla.1991). See In re McSheridan, 184 B.R. 91 (9th Cir. BAP 1995) Section 502(b)(6) provides a specific formula for calculating "damages resulting from the termination of a lease of real property...." 11 U.S.C. § 502(b)(6). In applying this section, however, courts are split on whether state law or federal law should be used to determine whether a particular rental agreement is a lease.

Some courts have held that "[t]he rights of the parties under a lease of real estate are to be determined by state law." In re Q–Masters, Inc., 135 B.R. 157, 159 (Bankr.S.D.Fla. 1991). See Butner v. United States 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). These courts have determined that "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding...." 440 U.S. at 55, 99 S.Ct. at 918. See Barnhill v. Johnson, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992).

Other courts, however, have determined that federal law should be used to determine whether an agreement is a lease for purposes of § 502(b)(6). These courts have reasoned that 11 U.S.C. § 365 and 11 U.S.C. § 502 both require courts to define the term "lease." "[R]ead together, [§ 365 and § 502] are part of a total scheme designed to set forth the rights and obligations of landlords and tenants involved in bankruptcy proceedings." In re PCH Associates, 804 F.2d 193, 199 (2d Cir.1986). Thus, in construing and applying § 365 and § 502, these courts have concluded that "[e]ven though a court's equity power is not a sufficient basis for overriding state law, the court's power to carry out bankruptcy objectives does provide an adequate foundation for applying a federal rule rather than state law to define property interests when the situation demands." In re KAR Development Associates, L.P., 180 B.R. 629, 637 (D.Kan.1995), stay denied, In re KAR Development Associates, L.P., 182 B.R. 870 (D.Kan.1995). See In re Moreggia

& *Sons, Inc.,* 852 F.2d 1179 (9th Cir.1988), and *In re PCH Associates,* 804 F.2d 193 (2d Cir.1986).

These courts further conclude that "the legislative history of § 502(b)(6), read together with § 365, shows Congressional intent that [federal law] be used to determine whether a real estate transaction should be characterized as a lease." *In re KAR Development Associates, L.P.,* 180 B.R. 629, 638 (D.Kan.1995), *stay denied, In re KAR Development Associates, L.P.,* 182 B.R. 870 (D.Kan.1995). This Court agrees that determining whether an agreement is a lease for purposes of § 502(b)(6) involves an overriding issue of federal law and that federal law should be utilized to fulfill the objectives of bankruptcy law in defining these particular property interests. *See In re KAR Development Associates, L.P.,* 180 B.R. 629, 638 (D.Kan.1995), *stay denied, In re KAR Development Associates, L.P.,* 182 B.R. 870 (D.Kan.1995).

### D. Applicability of § 502(b)(6)

■■■ The Bankruptcy Code provides two possible means of determining whether a particular transaction is a lease for purposes of imposing limitations on damages pursuant to § 502(b)(6). The first comes from an examination of the language in § 365(m), which states:

> (m) For purposes of this section … leases of real property shall include any rental agreement to use real property.

11 U.S.C. § 365(m).

The breach of a lease under § 365 entitles the landlord to damages under § 502. Thus, the Court finds that the definition of a lease under § 365 is also applicable to § 502. Under this analysis, the verbal rental agreement between BHMP and Challa's P.A. would be a lease for purposes of applying § 502(b)(6).

Some courts, however, have suggested that a more in-depth analysis of the agreement is necessary to determine if it is a lease. *See In re Hotel Syracuse, Inc.,* 155 B.R. 824, 838 (Bankr.N.D.N.Y.1993). A second provision in the code provides guidelines for such an analysis.

The legislative history of § 502(b)(6) utilizes an economic realities test to determine "whether a lease is a 'financing' lease rather than a 'true or bona fide' lease…." *In re KAR Development Associates, L.P.,* 180 B.R. 629, 635 (D.Kan.1995), *stay denied,* In re KAR Development Associates, L.P., 182 B.R. 870 (D.Kan.1995). *See* S.Rep. No. 989, 95th Cong., 2d Sess. 64 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5850. This test requires the Court to determine "whether the parties intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship." *In re PCH Associates,* 804 F.2d 193, 200 (2d Cir.1986). *See International Trade Administration v. Rensselaer Polytechnic Inst.,* 936 F.2d 744, 748 (2d Cir.1991). The test contains essentially five elements:

> (1) whether the amount of rent was calculated to compensate for use of the land or rather was based on some other purpose such as ensuring a particular return on an investment;
>
> (2) whether the property was purchased by the lessor specifically for the lessee's use;
>
> (3) whether the transaction was called a lease in order to gain certain tax advantages;
>
> (4) whether the lessee assumed many of the obligations normally reserved for the lessor; and
>
> (5) whether the agreement permits or requires the lessee to purchase the property for a nominal sum at the end of the lease term.

*In re KAR Development Associates, L.P.,* 180 B.R. 629, 639 (D.Kan.1995), *stay denied, In re KAR Development Associates, L.P.,* 182 B.R. 870 (D.Kan.1995). *See In re Hotel Syracuse, Inc.,* 155 B.R. 824, 838–39 (Bankr. N.D.N.Y.1993).

Challa's rental agreement with BHMP obligated him to a rental payment based on the actual square footage utilized by his P.A. plus sales tax. The rent payments were solely for use of space in the medical park and were not designed to ensure any investment return to Challa. The space rented by Challa's P.A. was not purchased specifically for that purpose. BHMP was created to host a vari-

ety of specializing physicians, and Challa's P.A. was simply one of many tenants. Neither Challa nor BHMP realized any tax advantage by calling the rental agreement a lease. Challa's P.A. was not obligated to perform the duties of the lessor, and was not given option to purchase the property at the end of the lease term. Based on these factors, the Court finds that the rental agreement between Challa's P.A. and BHMP was a lease and § 502(b)(6) is applicable for calculating damages resulting from the termination of that lease.[1]

### E. Amount of Claim for Lease Rejection Damages

Having found that § 502(b)(6) does apply to the verbal lease between BHMP and Challa's P.A., the Court will now determine the amount of allowable damages. Section 502(b)(6) states:

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates; ...

11 U.S.C. § 502(b)(6).

The Court must first decide the date from which damages should be calculated, utilizing the earlier of the petition date or the date on which the lessor repossessed or the lessee surrendered the property. In this case, the Challas filed their petition on April 14, 1992. According to the evidence presented, Challa vacated the leased property on

October 1, 1992. (Claimant's Ex. 35 at 36 and 42). For purposes of § 502(b)(6), the Court must use the date of the petition.

The Court must now determine the amount of rent reserved under the lease. The verbal lease contained a month-to-month lease term at a rate of $3,500 per month for 5,000 square feet. As previously discussed, the Court finds that Challa only used one half of the space and should only be obligated to pay for the value of 2,500 square feet. At a rate of $1,750 per month, one year's rent, including sales tax, would equal $22,260. Under a month-to-month lease, the remaining term of such lease could not be longer than one month. Fifteen percent of one month's rent would total $262.50. The Court is required to allow the greater of these two amounts and finds that the rent reserved by the lease is $22,260.

Finally, the Court must determine the amount of any unpaid rent due under the lease. The Court ordered administrative rent for the period between the petition date and the date Challa vacated the medical park. Thus, the Court finds that no rent is due under the lease.

Accordingly, the Court finds that the portion of claim 34 based on the lease between BHMP and Challa's P.A. is totaled as follows:

| | |
|---|---|
| Prepetition Rent | $34,200 |
| Lease rejection damages | 22,260 |
| **TOTAL** | **$56,460** |

This amount is subject to any amount of setoff that may be available to the debtors.

### II. Validity and Amount of Claim for Conversion

As originally filed, BHMP's claim contained a claim for conversion of corporate funds totalling $174,457.71. This portion of the claim was amended by BHMP in open Court, bringing the total conversion claim to $241,912.34. (Tr. Vol. II at 297). As previously discussed, BHMP bears the burden of proving the validity and the amount of its

---

1. While this Court is convinced that Federal law provides the applicable rule for defining a lease for purposes of § 502(b)(6), the Court notes that § 502(b)(6) would also be applicable if state law were used to determine whether the rental agreement was a lease. Pursuant to Fla.Stat.Ch. 83.01 (1993), a verbal agreement is a lease. See Pensacola Scrap Processors, Inc. v. State Road Department, 188 So.2d 38 (1st D.C.A.1966), cert. denied, State Road Dept. v. Pensacola Scrap Processors, Inc., 192 So.2d 494 (Fla.1966).

conversion claim. *See In re Haack,* 165 B.R. 501 (Bankr.M.D.Fla.1994).

"Conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the alteration or exclusion of the owner's rights." *In re Randall W. Van Loan,* 114 B.R. 760, 762 (Bankr.M.D.Fla.1990). Specifically in regards to actions for conversion of money, courts have found conversion where an unauthorized act of one party deprives another of a specific and identifiable amount of money. *Navid v. Uiterwyk Corporation,* 130 B.R. 594 (M.D.Fla.1991). Additionally, courts have found that "[n]either knowledge nor intent is required to maintain an action for conversion." *Id.* at 596.

BHMP's conversion claim is comprised of three elements. First, BHMP claims damages for conversion based on eight checks written by BHMP to or on behalf of the debtors. Second, BHMP claims that Challa was unjustly enriched by improvements performed in connection with the installation of water and sewer service, which benefitted BHMP and other business owned by Challa, but for which BHMP was required to pay one half rather than its proportional share. BHMP claims Challa converted its overpayment to his personal use. Finally, BHMP claims that Challa used $75,000 of a $275,000 future advance made to BHMP to pay off a personal line of credit.

### A. Conversion of money based on checks

The first portion of BHMP's conversion claim is based on the following items which the Court received into evidence:

| | |
|---|---|
| check # 136 from BHMP to Challa for | $130,000.00 |
| check # 447 from BHMP to Challa for | 1,500.00 |
| check # 449 from BHMP to Challa for | 3,000.00 |
| check # 451 from BHMP to Mid State Federal for | 3,343.05 |
| check # 452 from BHMP to Challa for | 1,500.00 |
| check # 453 from BHMP to Wayne (unknown) for | 1,200.00 |
| check # 455 from BHMP to Edward Dean for | 1,200.00 |
| check # 454 from BHMP to Peter Monteleone for | 1,000.00 |

(Claimants Ex. 4, 4a).

■ Item 1 is a check for $130,000 written from BHMP to Challa which bears the notation, "Reimbursement of money spent." (Claimant Ex. 4). BHMP alleges that Challa converted this money and used it for personal expenses. (Tr. Vol. II at 211 and 289). Challa claims the check was written to reimburse him for expenses he paid on behalf of BHMP. (Tr. Vol. I at 54–73). Challa, however, does admit that he accepted and cashed the check. (Tr. Vol. I at 54–55). Although Challa may be entitled to offset those alleged expenses against BHMP's claim, the Court finds that Challa deprived BHMP of $130,000 without authorization, and converted the money to his personal use.

■ Having reviewed the evidence, the Court finds that items 2–8 above are allowable as part of BHMP's conversion claim. On October 3, 1991, the stockholders and directors of BHMP agreed to relinquish all interest in the medical park to Challa, subject to certain contingencies related to Challa's assumption of liability to First Florida. (Debtors' Ex. 20 and 24, Tr. Vol. I at 87–93). Subsequent to this agreement, Challa operated the medical park as his corporation and used corporation funds to pay personal obligations. (Tr. Vol. I at 91). Items 2—8 total $12,743.05, which is a specific, identifiable amount of money. The money belonged to BHMP, and although Dr. Challa was authorized to act on behalf of the medical park, he was not authorized to use BHMP funds to pay personal obligations. The Court will allow this portion of BHMP's claim for conversion in the amount of $142,743.05.

### B. Conversion of Overcharge for Cost of Sewer Line

■ The second portion of BHMP's conversion claim is based on an alleged overpayment of BHMP for the installation of a sewer line which ultimately benefitted at least two other buildings owned by the debtors. (Tr. Vol. II at 198–200). BHMP argues that it only occupies 4.4 acres of the 34 acres which could be connected to the sewer line. (Tr. Vol. I at 167). Thus, BHMP claims it should only be responsible for its proportional share of the installation costs (twelve percent), and

that Challa converted BHMP's overpayment to benefit his other businesses. (Tr. Vol. II at 199 and 292). BHMP paid $3,130 to Black Diamond Ranch and $28,584.66 to Reynolds Construction in connection with the sewer line installation. (Tr. Vol. 1 at 80; Claimant Ex. 4a). Combined, these payments equal one half of the total installation cost. (Tr. Vol. I at 80).

Challa testified that zoning ordinances required the installation of the sewer line for the medical park, but that no other buildings owned by the Challas were under such requirement. (Tr. Vol. 1 at 85 and 170). Challa, however, also testified that he anticipated a future benefit from the installation, and subsequent to the installation, two buildings owned by Challa were connected to the sewer line. (Tr. Vol. I at 73–85). Upon the evidence presented, the Court finds that two Challa-owned businesses connected to the sewer line (Tr. Vol. 1 at 73–85 and 166–167). Thus, BHMP would be responsible for at least one third of the installation costs, totalling $21,143.11. BHMP originally paid $31,714.66 (Tr. Vol. I at 73, 80). Thus, BHMP could be entitled to claim conversion of an overpayment in the amount of $10,571.55.

The Court, however, finds that the evidence does not support BHMP's claim for conversion based on this alleged overpayment. BHMP was required to install the sewer line as a precondition for building the radiation center located in building two of the park. (Tr. Vol. I at 170). Thus, BHMP would have been responsible for the entire installation cost, regardless of whether or not Challa's other businesses would benefit from the line. BHMP benefitted from the installation and, with Challa's contribution to the costs, saved $31,714.66. Challa was authorized to act on behalf of BHMP and did so to its benefit in regards to the agreement for payment of the installation costs (Tr. Vol. I at 73–85). The Court will not allow BHMP's claim for conversion based on the alleged overpayment for the sewer line installation.

## C. Conversion of $75,000 for Personal Line of Credit

▉ The third portion of BHMP's conversion claim is based on its allegation that Challa received $75,000 from a loan made to BHMP. According to the evidence, BHMP borrowed $275,000 to complete building number four in the medical park. (Tr. Vol. II at 211). From this loan, $75,000 was used to pay off Challa's personal line of credit. (Tr. Vol. II at 212 and 297; Claimant Ex. 7). This loan, including the $75,000 used to pay Challa's credit line, remains a debt of BHMP. (Tr. Vol. II at 297).

The Court finds that Challa converted the $75,000 to his own use. Challa received the benefit of having a specific amount of money borrowed by BHMP to pay off his personal debt. Although Challa claims that this was a precondition to obtaining a loan for the medical park, the Court finds that this provision of the loan agreement was not in the best interest of BHMP, and that Challa acted beyond the scope of his authorization in making arrangements for the loan. Although Challa may be entitled to offset the value of any payments that he made toward the loan, the Court will allow BHMP's claim or conversion based on the $75,000 loan. (Tr. Vol. II at 343).

The Court finds that the total allowable amount of BHMP's claim for conversion is $217,743.05. This amount is subject to any right of set-off that may be available to the debtors.

## III. Total Amount of Claim

Notwithstanding any amount of setoff to which Challa may be entitled, the Court finds that the total allowable amount of claim 34, including prepetition rent, lease rejection damages, and conversion as follows:

| | |
|---|---|
| Prepetition Rent | $ 34,200.00 |
| Lease Rejection Damages | 22,260.00 |
| Conversion | 217,743.05 |
| | $274,203.05 |

## IV. Debtors' Demand for Setoff

The Court must now evaluate debtors' demand for setoff. Setoffs are governed by 11 U.S.C. § 553, which states:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under

this title against a claim of such creditor against the debtor that arose before the commencement of the case. . . .

11 U.S.C. § 553(a).

 This Court has held that "[s]etoff is a permissive doctrine that is within the equitable power of the Court to grant or deny." *In re Apex International Management Services, Inc.*, 155 B.R. 591, 596 (Bankr.M.D.Fla.1993). The doctrine of setoff is based on fairness, and the "only requirements are that the debts and claims be mutual and pre-petition." *Braniff Airways, Inc. v. Exxon Company, U.S.A.*, 814 F.2d 1030, 1035 (5th Cir.1987). *See In re Selma Apparel Corp.*, 155 B.R. 241 (Bankr.S.D.Ala.1992). The burden of proof "rests on the party articulating a right to setoff." *Matter of Aquasport, Inc.*, 155 B.R. 245, 248 (S.D.Fla. 1992), *appeal decided by ITT Commercial Finance v. Tavormina*, 985 F.2d 579 (11th Cir.1993).

 For purposes of determining the amount of setoff available to debtors, the Court finds that mutuality exists only between BHMP and the debtors. Accordingly, the Court will not consider evidence of debt between BHMP and Challa's P.A., or any evidence of debt which predates the incorporation of the medical park.

 The debtors have placed into evidence a series of checks which they claim substantiates BHMP's indebtedness to the debtors and validates the debtors' demand for setoff. First, the debtors offer Debtors' Exhibits 16a–16aa, claiming that these checks represent payments of medical park expenses paid by the Challas on behalf of BHMP. Having received Debtors' Exhibits 16a–16aa into evidence and having evaluated each check individually, the Court finds that exhibits 16a–16c predate the incorporation of BHMP and will not consider them for purposes of evaluating debtors' demand for setoff. The Court also finds that exhibits 16d and 16h are without authenticating notation and without more evidence, it is impossible to link these checks to BHMP expenses. The Court, therefore, finds it inappropriate to consider them as a part of debtors setoff demand. From this series of checks, the court will allow the following to be offset against BHMP's claim:

Debtors' Exhibits 16e, f, g, i, j, k, l, m, n, o, p, q, r, s, t, u, v, w, x, y, z, and aa. (Tr. Vol. I at 58–68). These checks represent a total of $30,667.88.

 Second, the debtors argue that Debtors' Exhibits 27–30 should be allowed as a portion of their demand for setoff against BHMP's claim. The Court, however, finds that these exhibits are checks written by Challas' P.A. and do not evidence a mutual debt between the debtors and BHMP. Thus, the Court will not consider these in determining the amount of debtors' setoff.

Third, the debtors argue that the checks received as Debtors Exhibits 31a–31i total $128,500, and that amount should be allowed as a portion of debtors' demand for setoff. (Tr. Vol. I at 120). These checks were written from the debtors directly to BHMP. BHMP does not dispute receipt of this money and the Court will allow this portion of debtors' demand for setoff in the amount of $128,500.

 Next, the debtors argue that their demand for setoff should include the amount represented by Debtors' Exhibits 32a–32k. Debtors argue that they wrote these checks to First Florida for payment of BHMP's mortgage. Having reviewed the exhibits, however, the Court finds that only four of these checks bear notations indicating the purpose of the checks. (Debtor's Ex. 32b, c, d, and k). Dr. Challa testified that he also paid mortgage payments to First Florida for other property owned by the debtors. (Tr. Vol. I at 127). The Court finds that without more evidence to link these payments directly to the BHMP mortgage, Exhibits 32a, 32e, 32f, 32g, 32h, 32i, and 32j are insufficient to support debtors' demand for setoff. Accordingly, the Court will allow the following checks to be offset against BHMP's claim:

Debtors' Exhibits 32b, c, d, and k.

(Debtors' Ex. 32b, c, d, and k). These checks represent a total of $26,944.32.

 Finally, debtors claim they are entitled to offset the amounts represented by Debtors Exhibits 33a—33aj, which they argue are payments made by the debtors for

miscellaneous bills relating to BHMP. (Tr. Vol. I at 128–37). The Court finds that twenty-six of these checks represent payments to BHMP creditors by the debtors. Having reviewed the evidence presented, the Court finds that the following exhibits, coupled with Dr. Challa's testimony, support the debtors' demand for setoff:

Debtors Exhibits 33a, b, c, d, f, g, h, i, k, l, m, o, p, r, s, t, v, w, x, y, z, aa, ab, ad, ah, ai.

(Tr. Vol. I at 128–137). These checks total $27,976.97.

■ Debtors' exhibits 33ae and 33aj represent payments of $800 and $195 respectively for which both BHMP and the debtors were required to pay one half. The evidence indicates that the debtors paid the full amount on both charges and are entitled to offset one half of the value of each of these checks against BHMP's claim. (Tr. Vol. I at 135 and 137; Debtors' Ex. 33ae and 33aj). Thus, the total allowable portion of debtors demand for setoff based on exhibit 33 is $28,474.47.

Based on the above analysis, the Court finds that the debtors' are entitled to offset $214,586.67 against BHMP's claim.

## V. CONCLUSION

Beverly Hills Medical Park's Claim 34 is valid. The Court finds the value of that claim to be $274,203.05. The Court also finds that debtors are entitled to offset $214,-586.67 against that claim. Therefore, by separate order, the Court will allow claim 34 in the amount of $59,616.38.